948 So.2d 774 (2006)
UNIVERSITY OF MIAMI, Petitioner,
v.
Lisa WILSON, etc., et al., Respondents.
No. 3D04-2939.
District Court of Appeal of Florida, Third District.
June 21, 2006.
Order Denying Rehearing February 28, 2007.
*775 Fowler White Burnett and Marc J. Schleier and June Galkoski Hoffman, Miami; George Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, and Arthur Lundeen, South Miami, for petitioner.
Hersch & Talisman and Patrice A. Talisman, Miami, for respondents.
Before WELLS, SHEPHERD, and ROTHENBERG, JJ.
Order Denying Rehearing En Banc February 28, 2007.
ROTHENBERG, Judge.
In this petition for writ of certiorari, the University of Miami ("University") is seeking to quash the trial court's order denying its motion to dismiss a wrongful death action filed against it by the decedent's daughters, Lisa Wilson and Keisha Salmon, based upon their failure to comply with the medical malpractice presuit notice requirements.
On October 11, 2002, Marjorie Salmon-Graham died intestate as a result of breast cancer. On September 11, 2003, her daughters, Lisa Wilson and Keisha Salmon, served the University and others with a presuit notice of intent to initiate litigation for medical malpractice. The daughters subsequently filed a wrongful death action against the University and other defendants, alleging that their failure to diagnose Ms. Salmon-Graham's breast cancer resulted in her death. The caption of the wrongful death complaint described the plaintiffs as "LISA WILSON and KEISHA SALMON as nominated Co-Personal Representatives and/or any duly appointed Personal Representative(s) of the ESTATE OF MARJORIE SALMON-GRAHAM, deceased."
The University moved to dismiss the complaint, arguing that because the notice of intent to initiate litigation was not served by a duly appointed personal representative of the decedent's estate, it failed to satisfy the medical malpractice presuit notice requirement of Chapter 766, Florida Statutes (2002), a condition precedent to maintaining an action for medical malpractice, and was, therefore, a nullity. At the hearing on the motion to dismiss, Ms. Wilson and Ms. Salmon's attorney informed the court that the daughters, who had already initiated the process to be appointed as the personal representatives of their mother's estate, were expected to be appointed "within a week or two." The trial court denied the University's motion to dismiss, and Ms. Wilson and Ms. Salmon were subsequently appointed as co-personal representatives of their mother's estate.
In its petition for writ of certiorari, the University claims that the trial court's denial of its motion to dismiss was a departure from the essential requirements of the law. The University asserts that the plaintiffs did not comply with the medical malpractice presuit notice requirement because the notice must be filed by a claimant who received negligent medical care or by the personal representative of the person who received the negligent medical care. The University alleges that this requirement was not met in the instant case *776 because Ms. Wilson and Ms. Salmon were not "claimants" pursuant to sections 766.106(2) and 766.202(1) of Florida's Medical Malpractice Act ("Act"), and had not been appointed as personal representatives at the time they served their notice. Ms. Wilson and Ms. Salmon argue that (1) their notice, which placed the University on notice of the alleged malpractice and provided the University with the opportunity to investigate the allegations, satisfied the purpose and intent of the statute, and (2) as named personal representatives, they should not be precluded from pursuing a claim on behalf of the estate, as their appointment relates back in time, validating the actions that they took prior to their appointment.
Our review of the trial court's disposition of the motion to dismiss is de novo. Apostolico v. Orlando Reg'l Health Care Sys., Inc., 871 So.2d 283, 286 (Fla. 5th DCA 2004). The question we must answer in this petition is whether, as a matter of law, a medical malpractice presuit notice is invalid when it is served by persons who were not personal representatives when the notice was served, but are subsequently appointed.
The medical malpractice presuit notice requirement is found in section 766.106(2), Florida Statutes (2002), which provides, in pertinent part:
prior to filing a claim for medical negligence, a claimant shall notify each prospective defendant by certified mail, return receipt requested, of intent to initiate litigation for medical malpractice.
"Timely written notice of intent to initiate litigation is a condition precedent to maintaining a medical malpractice action." Patry v. Capps, 633 So.2d 9, 11 (Fla.1994).
On September 11, 2003, Ms. Wilson and Ms. Salmon, the decedent's surviving daughters, noticed the University regarding their intent to pursue a wrongful death medical malpractice claim against it for the death of their mother, by sending the University a Notice of Intent to Initiate Litigation, as required pursuant to section 766.106(2), Florida Statutes (2002). The notice informed the University that they were the survivors of the deceased and of the basis for their negligence claim.
There are certain requirements which must be met before issuing a notification of intent to initiate medical malpractice litigation. Prior to filing a complaint, the plaintiff must conduct an investigation to determine if a named defendant was in fact negligent and that such negligence resulted in the claimed injury, and obtain corroboration by a medical expert, along with a verified written opinion from the medical expert, supporting the claim of medical negligence. Apparently, these requirements were satisfied, as the University has made no claim that they were not. Additionally, the Act requires that, upon receiving the notice, the medical provider must conduct an investigation to determine the reasonableness of the plaintiff's claim and obtain corroboration prior to rejecting the claim. While the record and briefs are silent as to whether the University satisfied its obligations and whether it rejected the claim, we must assume it did, as the plaintiffs filed suit and these issues have not been raised by either party.
Despite the fact that Ms. Wilson and Ms. Salmon conducted the requisite investigation, obtained the necessary corroborating verified medical expert opinion, and gave the University notice of their intent to file a medical malpractice claim; despite the fact the University conducted its own investigation and rejected the reasonableness of the claim; and despite the fact that Ms. Wilson and Ms. Salmon timely filed their complaint and were ultimately appointed *777 as personal representatives of the estate; the University and the dissent argue that the complaint should be dismissed, now that the statute of limitations has run, because the daughters were not "claimants" or personal representatives at the time they noticed the University. We disagree.
The policy underlying the medical malpractice statutory scheme is to require the parties to engage in meaningful presuit investigation, discovery, and negotiations, thereby screening out frivolous lawsuits and defenses and encouraging the early determination and prompt resolution of claims. Kukral v. Mekras, 679 So.2d 278, 284 (Fla.1996). The presuit notice provides notice to the medical provider and requires an investigation of the matter, in an effort to encourage presuit settlements. Otto v. Rodriguez, 710 So.2d 1, 2 (Fla. 4th DCA 1998); Fort Walton Beach Med. Ctr., Inc. v. Dingler, 697 So.2d 575, 579 (Fla. 1st DCA 1997); Chandler v. Novak, 596 So.2d 749, 750 (Fla. 3d DCA 1992). The University argues that, because the legislative purpose of the Act is to promote presuit settlement, we must interpret section 766.106(2) to require that the notice of intent to initiate litigation be served by a person who had already been appointed as a personal representative because only a personal representative has the power to settle an action for wrongful death. See Saia Motor Freight Line, Inc. v. Reid, 888 So.2d 102, 103 (Fla. 3d DCA 2004)(stating that only personal representatives have the authority to settle a wrongful death action); Thompson v. Hodson, 825 So.2d 941, 949 (Fla. 1st DCA 2002)(explaining that, by statute, a wrongful death claim is brought by only one plaintiff โ the personal representative of the estate of the deceased). The University argues that, because Ms. Wilson and Ms. Salmon were not personal representatives at the time they served the notice, the University could not settle the claim with them.
Both the Florida Supreme Court and this court have held that when interpreting section 766.106(2) regarding presuit notice, we must not unduly restrict the access to the courts guaranteed by the Florida constitution in carrying out the legislative purpose of the Act. Kukral, 679 So.2d at 284; see also Patry, 633 So.2d at 13 ("[W]hen possible, the pre-suit notice and screening statute should be construed in a manner that favors access to courts."); Garay v. Colony Springs Med. Ctr., Inc., 731 So.2d 849 (Fla. 3d DCA 1999)(declining to adopt a hyper-technical view of section 766.106, which would impermissibly infringe upon the constitutional right of access to the courts).
Ms. Wilson and Ms. Salmon argue that, because they were ultimately appointed personal representatives, their powers as personal representatives should relate back, thereby validating the actions they took prior to their appointment. We agree as there is both statutory and case law support for such a finding. Chapter 733 of the Florida Statutes is the Probate Code and deals with the administration of estates. Section 733.601, Florida Statutes (2002), specifically provides that
The duties and powers of a personal representative commence upon appointment. The powers of a personal representative relate back in time to give acts by the person appointed, occurring before appointment and beneficial to the estate, the same effect as those occurring after appointment. A personal representative may ratify and accept acts on behalf of the estate done by others when the acts would *778 have been proper for a personal representative.
(Emphasis added).
Even early Florida jurisprudence recognized that acts of a personal representative prior to his/her appointment may be validated upon appointment. See Griffin v. Workman, 73 So.2d 844 (Fla.1954)(acknowledging the "ancient doctrine" which validates the acts of a personal representative prior to his appointment and noting that "a wide variety of acts and conduct" have been validated by subsequent qualification of an administrator, including an advancement to a distributee, the sale of estate property, the execution of a deed, and the institution of a wrongful death action); see also Talan v. Murphy, 443 So.2d 207, 208 (Fla. 3d DCA 1983)(holding that, although Talan brought a wrongful death action without having been appointed as personal representative, his subsequent appointment related back and his acts were thereby validated insofar as they were acts he could have performed had he been qualified as a personal representative, and finding that it was not necessary for him to allege in his original complaint that he was the personal representative).
In Bermudez v. Florida Power & Light Co., 433 So.2d 565 (Fla. 3d DCA 1983), the decedent's mother filed a wrongful death complaint against Florida Power & Light (FP & L) and the City of Coral Gables ("City") on June 11, 1981, nearly three years after her son was electrocuted when a power line touched a pole he was holding. At the time she filed the complaint, she had not yet been appointed as the personal representative of her son's estate. She was appointed on July 23, 1981, after the statute of limitations had run. The trial court granted FP & L's and the City's motions to dismiss, finding that since the personal representative was not appointed until after the statute of limitations had run, the complaint was untimely. On appeal, FP & L and the City argued that since the Wrongful Death Act, งง 768.16-7, Fla. Stat. (1981), makes it mandatory that an action for wrongful death be filed by the personal representative, the action initiated prior to the appointment of the personal representative was a nullity. We disagreed and reversed, concluding that, "It is well established, however, that whether `shall' is mandatory or discretionary will depend upon the context in which it is used and the legislative intent expressed in the statute." Id. at 566-67. In reaching this conclusion, we found controlling the Florida Supreme Court's holding in Griffin.
We find that the case of Griffin v. Workman, 73 So.2d 844 (Fla.1954) controls the disposition of the action sub judice. On facts nearly identical to those in the case at bar, the Florida Supreme Court said:
We have the opinion that the circuit court committed reversible error in not allowing the cause to proceed after letters of administration had been issued in the probate proceedings, and in refusing to relate the issuance of the letters back to the time of the beginning of the suit . . . No fraud or inequity is involved, and no new cause of action would have been presented by allowing the father to prosecute the action to a conclusion. We think, therefore, that the issue is ruled by the ancient doctrine "that whenever letters of administration are granted they relate back to the intestate's or testator's death".
Bermudez, 433 So.2d at 566 (quoting Griffin, 73 So.2d at 846).
The purpose of the presuit requirement is to allow a potential defendant to investigate a claim and to encourage settlement prior to costly and time-consuming *779 litigation. Because the notice sent to the University by Ms. Wilson and Ms. Salmon described their claim with sufficient detail to enable the University to investigate the claim, they satisfied their statutory duty and should not be denied access to the courts. See Chandler, 596 So.2d at 750-51.
The University and the dissent, however, argue that because the legislative purpose of the presuit notice requirement is also to promote early settlement of claims, and since only the personal representative has the authority to settle a claim, the University was precluded from exercising its option to settle, thereby, frustrating the legislative purpose. We find this argument unpersuasive and in conflict with Berges v. Infinity Insurance Co., 896 So.2d 665 (Fla.2004).
The argument is unpersuasive as the University rejected the plaintiffs' claim of negligence, determining after its investigation, that the claim was unfounded. At no time did it express any intent to enter into settlement negotiations. The Florida Supreme Court in Berges has also rejected this argument, specifically holding that the "relation back doctrine" includes settlement negotiations performed by a personal representative prior to his/her appointment. A review of Berges follows.
Berges was the defendant in a wrongful death action. After receiving an adverse jury verdict that substantially exceeded his policy limits, Berges sued his insurance company claiming it had acted in bad faith by failing to settle or to advise him of a settlement offer made by the decedent's husband. The jury agreed with Berges, finding that the insurance company acted in bad faith, and the trial court entered an amended final judgment in favor of Berges, which the insurance company appealed. On appeal, the Second District reversed, finding that, since the decedent's husband had not been appointed as personal representative when he offered to settle the case, he was without the authority to make a valid settlement offer. The Second District found that the insurance company, therefore, as a matter of law, could not have acted in bad faith in failing to advise Berges of the offer. Id. at 671-72. The Florida Supreme Court, however, reversed the Second District, rejecting its conclusion that a settlement offer for a wrongful death claim is not valid if the person who made the offer has not yet been appointed as a personal representative. Id. at 675. The court explained that:
[T]he statutory scheme governing estates . . . anticipates valid negotiations prior to court involvement. Specifically, the legal acts of a personal representative relate back after court appointment, thereby validating the previous acts of the personal representative on behalf of the estate. Thus, the statutory scheme[ ] governing . . . estate claims contemplate[s] the completion of settlement negotiations prior to court approval. This scheme is consistent with the purposes of settlement, which are to simplify and shorten litigation, save costs to parties, and ease the burden on the courts by obviating the necessity of trial.
Id. at 674-75 (citations omitted). The Florida Supreme Court, therefore, concluded that the Second District erred in determining that the decedent's husband did not make a valid offer to settle the case. Id. at 675.
As the Florida Supreme Court has held that the relation back doctrine applies to settlement offers made by individuals prior to their appointments as personal representatives, we reject the University and the dissent's argument that the University could not settle the claim with Ms. Wilson and Ms. Salmon because when they submitted *780 their presuit notice, they had not yet been appointed personal representatives of the estate. Under Berges, an agreement to settle between the University and Ms. Wilson and Ms. Salmon could have been held in abeyance and could have been validated upon their subsequent appointment as personal representatives. Thus, we conclude that the purpose of promoting settlement, which underlies the presuit notice requirement, was served by the notice filed in the instant case.
The dissent spends a great deal of time, and ink, discussing why it believes it is important for a claim to be brought by a true claimant (i.e. a duly appointed representative): (1) because only a claimant has the authority to settle a wrongful death action during the presuit notice period; (2) relaxing the requirement "inhibits the goal of promoting pre-suit settlement [of] claims"; (3) it assures that potentially responsible parties can readily assess their exposure; and (4) it lessens the risk of disagreement among putative claimants or personal representatives. While these arguments are meritorious, they are irrelevant to the issue before us, as the University rejected Ms. Wilson and Ms. Salmon's claim after doing its own independent investigation. Therefore, the University was not "inhibited" in negotiating a settlement nor was it frustrated by attempting to settle with parties who lacked the authority to do so. More importantly, the case law, as has already been discussed, permits the parties to negotiate a settlement and to ratify the settlement after they are duly appointed as personal representatives of the estate.
In attempting to avoid the application of the "relation back" doctrine, which specifically permits the powers of a personal representative in an estate action to relate back to acts taken prior to appointment as the personal representative, the dissent cites to cases issued by the Florida Supreme Court in 1931, Livingston v. Malever, 103 Fla. 200, 137 So. 113 (1931), and in 1912, La Floridienne, J. Buttgenbach & Co., Societe Anonyme v. Atlantic Coast Line Railroad Co., 63 Fla. 213, 58 So. 186 (1912), which held that the relation back of amendments should not be applied when it operates to cut off a substantial right or defense. The dissent, however, fails to apply the holdings in these cases to the issue before us or to articulate what substantial right or defense was forfeited by the University which rejected the daughters' claim as unfounded. In fact, were we to rule otherwise, the only substantial right forfeited would be that of the decedent's family, which would be denied its constitutional right to access our courts. We are not dealing with an amendment or new law. Griffin was decided in 1954 and concluded that the trial court erred in refusing to relate the issuance of the letters of administration back to the time of the beginning of the lawsuit. Griffin, 73 So.2d at 846. Bermudez, decided by this court in 1983, likewise found that a wrongful death lawsuit filed prior to the appointment of the personal representative would relate back to the date of the timely filed complaint. We see no reason to treat wrongful death actions based upon medical malpractice differently than wrongful death actions in general.
Lastly, we disagree with the recitation of the facts provided in the dissent and the conclusions made therefrom, which cast Ms. Wilson and Ms. Salmon's delay in obtaining their appointment as personal representatives of their mother's estate in a rather dim light. The dissent states that: "It is not a far leap to conclude that their delay in consummating this most routine of tasks incident to the prosecution of a wrongful death case was inspired by their own strategic and tactical interests"; "Although the daughters apparently elected *781 to delay the performance of this most routine of probate procedures for reasons of their own, the majority nevertheless redeems them from any legal consequence of their decision on the ground that when interpreting section 766.106(2) . . . not unduly restrict the access to the courts guaranteed by the Florida constitution . . ."; and "The daughters elected not to prosecute their interests." With all due respect for the author of the dissent, there is nothing in the record or briefs to even remotely suggest that Ms. Wilson and Ms. Salmon purposely delayed their appointments as personal representatives. In fact, to the contrary, the only record evidence as to the reason for their late appointment was offered during oral argument before this court, where we learned the delay was due to the fact that the decedent's husband, as next of kin and the person most eligible to assume the responsibility of personal representative of his wife's estate, had not lived in the marital home for several years prior to his wife's death and his whereabouts was unknown. After attempting in vain to locate him, the decedent's two daughters took provident action to protect the estate by sending presuit notice to the University before the statute of limitations ran. As soon as they were able to locate the decedent's husband, who signed a disclaimer waiving his statutory preference to be appointed as the personal representative of his deceased wife's estate and consented to the daughters' appointment as co-personal representatives, Ms. Wilson and Ms. Salmon obtained the necessary letters of administration and immediately amended the complaint. Section 733.601, Florida Statutes, regarding the administration of estates, specifically permits the actions of a personal representative, taken before being appointed, to be ratified on behalf of the estate, and if those actions benefit the estate, they are given the same effect as those occurring after appointment. As Ms. Wilson and Ms. Salmon were appointed as the personal representatives of the estate, and the actions they took prior to their appointment were clearly beneficial to the estate, the law permits their powers to relate back to the presuit notice and the filing of the complaint once the University rejected their claim. We, therefore, deny the petition for writ of certiorari.
Petition denied.
WELLS and ROTHENBERG, JJ., concur.
SHEPHERD, J., dissenting.
Respectfully, I would grant the petition in this case and quash the trial court's order denying the motion to dismiss.
As the majority correctly states, section 766.106(2) of Florida's Medical Malpractice Act (the Act) requires:
[P]rior to filing of a claim for medical negligence, a claimant shall notify each prospective defendant by certified mail, return receipt requested, of intent to initiate litigation for medical malpractice.
ง 766.106(2), Fla. Stat. (2002)(emphasis added).
However, the majority ignores the fact that a "claimant" is expressly defined in the Act. Section 766.202(1) states:
"Claimant" means any person who has a cause of action for damages based on personal injury or wrongful death arising from medical negligence.
ง 766.202(1), Fla. Stat. (2002)(emphasis added). In a wrongful death case, such as this, the cause of action lies in a duly appointed "personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages . . . caused by the injury. . . ." ง 768.20, Fla. Stat. (2002); Toombs v. Alamo Rent-A-Car, *782 Inc., 833 So.2d 109, 112 (Fla.2002); Hess v. Hess, 758 So.2d 1203, 1204-05 (Fla. 4th DCA 2000)("Section 768.20 requires that a wrongful death action be brought by the decedent's personal representative, `who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in [the Wrongful Death Act]. . . . '").
Because neither Lisa Wilson nor Keisha Salmon was a duly qualified personal representative of their mother's estate at any time pre-suit, it is indisputable they were not statutorily authorized "claimants" for purposes of the Act, entitled to serve a Notice of Intent to Sue or represent the estate pre-suit. Indeed, it appears they intentionally delayed filing a petition for administration of the estate, see ง 733.202, Fla. Stat. (2002), and sought to have themselves appointed co-personal representatives of the estate prior to serving their Notice for their own strategic and tactical reasons. I do not believe the relation-back doctrine operates to redeem the daughters from the consequences of their decision. Nor, in my view, does the access to courts doctrine compel us to suspend the natural workings of the pre-suit notice requirements of the Act. To the contrary, I believe the majority's decision to ignore the clear and unambiguous statutory requirement that the Notice of Intent to initiate litigation be given by a "claimant" is indefensibly eviscerative of the legislative purpose that inspired the pre-suit provisions of the Act. Therefore, I would grant the petition for certiorari in this case and order the complaint be dismissed.

DISCUSSION
Marjorie Salmon-Graham died intestate on October 11, 2002. The cause of her death was breast cancer. On September 11, 2003, Salmon-Graham's two surviving children, Lisa Wilson and Keisha Salmon, served a Notice of Intent to initiate a lawsuit for medical malpractice on the University of Miami and some two dozen other health care providers who had been involved in Salmon-Graham's care and treatment. The Notice was served by Wilson and Salmon as "survivors of Marjorie Salmon-Graham, deceased."[1] There is nothing in the Notice to suggest these individuals were at the time personal representatives of the estate of Ms. Salmon-Graham or seeking to become so.
On February 6, 2004, after the pre-suit investigation period under the Act had passed, see ง 766.106(3)(a), Fla. Stat. (2002), Wilson and Salmon filed their initial complaint. Shortly thereafter, they amended their complaint and, on April 30, 2004, served it on the University. The Amended Complaint reflected Wilson and Salmon brought the action as "nominated Co-Personal Representatives and/or duly appointed Personal Representative(s) of the Estate of Marjorie Salmon Graham." However, there is no record evidence they had taken the first step to petition the probate court for administration of the estate or to have themselves appointed as personal representatives even at this time. In fact, they did not do so until December 13, 2004, fourteen months after serving their Notice, ten months after the filing of the initial complaint, and only after receiving *783 just a few weeks earlier a "Disclaimer and Assignment of Entire Interest in Estate" from Salmon-Graham's widower, Eric Graham. In that disclaimer, the surviving husband disclaimed succession to any interest in Salmon-Graham's estate, waived his statutory preference to be appointed as the personal representative of Salmon-Graham's estate,[2] and consented to the daughters' appointment as co-personal representatives. Seven days later, on December 20, 2004, letters of administration were issued to the daughters. It is not a far leap to conclude their delay in consummating this most routine of tasks incident to the prosecution of a wrongful death case was inspired by their own strategic and tactical interests.[3]
Although the daughters apparently elected to delay the performance of this most routine of probate procedures for reasons of their own, the majority nevertheless redeems them from any legal consequence of their decision on the ground "that when interpreting section 766.016(2) . . . we must not unduly restrict the access to the courts guaranteed by the Florida constitution. . . ." Supra p. 777. Underlying this interpretation is the majority's apparent belief that the requirement is "hyper-technical." See supra p. 777. I do not find the requirement that Notice be given by a "claimant" "hyper-technical." To the contrary, I find it central to the proper and effective functioning of the presuit notice and investigatory scheme.
As previously stated, the legislative purpose behind presuit notice provisions of the Act is prompt resolution of valid medical negligence claims. ง 766.201, Fla. Stat., et seq.; Kukral v. Mekras, 679 So.2d 278, 284 (Fla.1996). The original legislative plan to achieve this objective, which survives to this day, "consist[s] of two separate components, pre-suit investigation and [binding] arbitration." ง 766.201, Fla. Stat. (1988).[4] Toward this objective, the presuit provisions of Chapter 766 first force a claimant to conduct an investigation of the suspected malpractice and the defenses which may be asserted. ง 766.104, Fla. Stat. (2002). The burden is on the medical malpractice claimant to make a "reasonable investigation" to determine there are grounds for a good faith belief there has been negligence. Id.
*784 Once the claimant's investigation is complete, the Act requires the claimant serve all potential defendants with a Notice of Intent to initiate litigation corroborated by a medical expert opinion. ง 766.106(2), Fla. Stat. The defendants then have ninety days to conduct their own pre-suit investigation. ง 766.106(3)(a), Fla. Stat. (2002). During this ninety-day period, the claimant may not file suit. ง 766.106(3)(a), Fla. Stat. When the defendants' evaluation is completed, they have four options: (1) reject the claim; (2) make an offer of settlement; (3) admit liability and submit to arbitration on damages; or (4) give no response. งง 766.106(3)(b), 766.203(3), Fla. Stat. (2002). The failure of either party to act in good faith in the pre-suit process subjects it to sanctions. See ง 766.205(2), Fla. Stat. (2002)(providing that failure of a party to comply with good faith pre-suit discovery requirements "shall be grounds for dismissal of any applicable claim or defense ultimately asserted").
Because of the intricacies of the pre-suit notice provisions of the Act, the distinct legislative goal, and the brief interlude wedged into the adversarial process by the legislature for its accomplishment โ ninety days in the usual case[5] โ I do not believe it "hyper-technical" to require that the parties at the table be the persons who have suffered the injury or hold the claim โ the "claimants" within the meaning of the Act โ and the potentially responsible defendants. The facts of this case illustrate why.
In the first place, neither Wilson nor Salmon had the authority to settle the wrongful death action during the presuit notice period. See Pearson v. DeLamerens, 656 So.2d 217, 220 (Fla. 3d DCA 1995); Thompson v. Hodson, 825 So.2d 941, 949 (Fla. 1st DCA 2002). Relaxing the legislative scheme inhibits the goal of "promoting pre-suit settlement [of] claims." See Kukral, 679 So.2d at 282 ("The purpose of a notice of intent to sue is to give the defendant notice of the incident in order to allow investigation of the matter and promote presuit settlement of the claim."). Second, adhering to the requirement that the party giving Notice be a "claimant" assures that potentially responsible parties can readily assess their exposure. The University properly argues here it was prejudiced by an inability to readily assess exposure. We do not know when the husband appeared on the scene; nor were the names of the potential beneficiaries of estate reasonably ascertainable until the petition for administration was filed on December 13, 2004. ง 733.212(1), Fla. Stat. (2004). Third, adhering to the legislative requirement assures the potentially responsible party it is dealing with the correct party, and lessens the risk of disagreement among putative claimants or putative personal representatives. If the decedent's spouse had not been subdued in this case, dueling Notices of Intent were not beyond the pale. Prejudice abounds in this case, and messier ones are easily fathomable.[6] The respondents' "access to courts" plea has a seductive but legally hollow ring. *785 The daughters elected not to prosecute their interests. Where a party has not established his right to pursue his legal interest, the law requires dismissal.
The doctrine of relation back, found in section 733.601 of the Florida Statutes, does not extricate the daughters in this case either. The statute reads in relevant part:
The powers of a personal representative relate back in time to give acts by the person appointed, occurring before appointment and beneficial to the estate, the same effect as those occurring after appointment. A personal representative may ratify and accept acts on behalf of the estate done by others when the acts would have been proper for a personal representative.
ง 733.601, Fla. Stat. (2002).
This statute, adopted by the state legislature in 1974, see Ch. 74-106, ง 1, Laws of Fla., codified the ancient doctrine "that whenever letters of administration or testamentary are granted they relate back to the intestate's or testator's death." Griffin v. Workman, 73 So.2d 844, 846 (Fla.1954)(internal quotations omitted). In that case, a defendant sought to dismiss a wrongful death action where the letters of administration were issued after the statute of limitations had run. Reversing a dismissal of the action by the trial court, the Florida Supreme Court in Griffin wrote, in an oft-quoted passage:
We have the opinion that the circuit court committed reversible error in not allowing the cause [of action] to proceed after letters of administration had been issued in the probate proceedings, and in refusing to relate the issuance of the letters back to the time of the beginning of the suit. The claim which formed the basis for the wrongful death action was a claim of the estate of the decedent; indeed, [it] was the only asset of the estate. The suit was brought . . . by the person who was immediately entitled to administration. No fraud or inequity is involved, and no new cause of action would have been presented by allowing the father to prosecution the action to a conclusion.
Id. at 846 (emphasis added)(internal citations omitted); see also Bermudez v. Fla. Power & Light Co., 433 So.2d 565, 566 (Fla. 3d DCA 1983)(reversing the dismissal of a wrongful death case based "[o]n facts nearly identical to those in [Griffin]"); Talan v. Murphy, 443 So.2d 207 (Fla. 3d DCA 1983)(accord).
However, none of these authorities arose in the specialized field of medical malpractice, where both the ability to maintain the action and to present defenses to it are expressly conditioned upon the discharge pre-suit of a well-crafted, exacting, statutorily-prescribed investigation process designed to weed out frivolous claims and submit to negotiation or arbitration those that are valid. In the context of medical malpractice wrongful death actions, our supreme court has ruled that if there exists an express provision that controls, the more general is inapplicable. Ash v. Stella, 457 So.2d 1377 (Fla.1984). In Ash, a surviving husband brought a medical malpractice wrongful death action in his capacity as the personal representative of the estate of his deceased wife against Dr. Terrence Ash, a chiropractic physician. Ash moved to dismiss the action on the ground that it was filed one week after the expiration of the two-year statute of limitations expressly applicable to medical malpractice actions. See ง 95.11(4)(b), Fla. Stat. (1979). The husband countered that the statute of limitations applicable to wrongful death, section 95.11(4)(d), controlled.[7]
*786 At the time of the decedent's death, section 95.11(4)(b) read:
(b) An action for medical malpractice shall be commenced within two years from the time the incident occurred giving rise to the action, or within two years from the time the incident is discovered, or should have been discovered with the exercise of due diligence, provided, however, that in no event shall the action be commenced later than four years from the date of the incident or occurrence out of which the cause of action accrued. An action for medical malpractice is defined as a claim in tort or in contract for damages because of the death, injury, or monetary loss to any person arising out of any medical, dental, or surgical diagnosis, treatment, or care by any provider of health care.
ง 95.11(4)(b), Fla. Stat. (1979)(emphasis added). The emphasized language had only recently been added. See Ch. 75-9, ง 7, Laws of Fla. The Florida Supreme Court was presented with the question of whether to apply the limitation period applicable to wrongful death actions or the medical malpractice limit. The court held that the medical malpractice limit applied, stating:
This [added] language was originally adopted in 1975. Before that time the statute of limitations governing malpractice suits did not apply to wrongful death actions. However, by [later] defining an `action for medical malpractice' to include a claim in tort for damages because of death, the legislature clearly intended this section to apply to wrongful death actions in cases where the basis for the action is medical malpractice.
Ash, 457 So.2d at 1379 (internal citations omitted)(emphasis added). In so holding, Florida aligned itself with many other courts around the country, which interpret their medical malpractice statutes "consistent with legislative intent to impose constraints on malpractice actions so that wrongful death actions arising from medical malpractice are procedurally controlled by the malpractice provisions."[8]James v. Phoenix Gen. Hosp., Inc., 154 Ariz. 594, 601-02, n. 12, 744 P.2d 695 (1987)(listing cases including Ash). As in Ash, we likewise are confronted here with an express statutory provision. The provision commands that the person who gives notice must be the "claimant [with the] cause of *787 action." ง 766.202(1), Fla. Stat. There are good reasons for that legislative choice in the medical malpractice context. We should honor that decision.
Moreover, adhering to this analysis does not offend the relation-back doctrine. The doctrine is not slavishly applied. See Gilson v. Foltz, 431 So.2d 647 (Fla. 2d DCA 1983)(reversing decision of trial court that permitted jury to reduce negligence verdict against counsel who drafted will of decedent by comparative negligence of personal representative before he was appointed, holding that the doctrine as elucidated in Griffin only applies for "certain purposes"); see also Livingston v. Malever, 103 Fla. 200, 214, 137 So. 113, 118 (1931)("The doctrine of relation back of amendments to the commencement of a suit is a fiction of law, and should never be applied when it will operate to cut off a substantial right or defense. . . . ")(internal citation omitted); La Floridienne, J. Buttgenbach & Co. v. Atlantic Coast Line R.R. Co., 63 Fla. 213, 218, 58 So. 186, 188 (1912)("[T]he statute and rules allowing amendments do not give such amendments the benefit of the legal fiction of relation back to the beginning of the action, so as to deprive a defendant of a right to the bar of a statute of limitations."). In fact, Griffin itself is grounded on a finding that "no fraud or inequity is present." Griffin, 73 So.2d at 847 (pointing out that "the defect in legal capacity [was corrected] before the defense of limitations has been formally raised and before the motion calling such defective capacity to the attention of the court has come on for hearing").
Applying the doctrine in this case is inequitable for at least two reasons. First, operating under the cloak of ancient precedent, we simply are putting our thumb on the scale to rescue the daughters from their own strategic and tactical decisions. Secondly, we unnecessarily are toying with an intricate and finely balanced legislative scheme developed after careful consideration to address concerns that the legislature found to exist both in the medical liability insurance industry and in assuring compensation for injured persons for harms caused to them by health care providers. See Echarte, 618 So.2d at 192. I see no constitutional impetus that requires us to re-write the law.
Accordingly, I would grant the petition and quash the decision below.

ON MOTION FOR REHEARING AND MOTION FOR CERTIFICATION
PER CURIAM.
The motion for rehearing and motion for certification are denied.
Before GERNSTEN, GREEN, FLETCHER, RAMIREZ, WELLS, SHEPHERD, SUAREZ, CORTINรS, ROTHENBERG and LAGOA, JJ.

ON MOTION FOR REHEARING EN BANC
PER CURIAM.
The motion for rehearing en banc is denied.
SHEPHERD, J., concurring.
I join the court's denial of Petitioner University of Miami's Motion for Rehearing En Banc and/or Certification of a Question of Great Public Importance. Because I perceive an undisciplined practice of some appellate counsel to seek en banc review of arguments rejected in panel decisions of this court,[1] I write to emphasize *788 why I believe denial is appropriate in this case.
In its motion, the University urges that en banc treatment is warranted because an "issue" of exceptional importance regarding the proper treatment of the presuit notice requirement has been raised. This argument misses the point of a motion for rehearing en banc. For the reasons expressed below, I believe a motion for rehearing en banc alleging exceptional importance must establish that the case, rather than an issue in the case, is of exceptional importance.
I begin with the text of the rule. Florida Rule of Appellate Procedure 9.331(d) authorizes motions for rehearing en banc in but two circumstances: (1) "[where] such consideration is necessary to maintain uniformity in the court's decisions," or (2) "the case is of exceptional importance." Fla. R.App. P. 9.331(d)(emphasis added). In the latter case, Rule 9.331(d)(2) requires the moving party's counsel unequivocally to state in the motion: "I express a belief, based on a reasoned and studied professional judgment, that the panel decision is of exceptional importance." Fla. R.App. P. 9.331(d)(2)(emphasis added). Nothing in the text of the rule suggests that en banc review may be considered based solely on an issue raised by the litigants. Applying ordinary meaning to the words used, I read the rule to mean there must be something about the case itself, rather than an issue decided in the case, which requires resolution by the entire court en banc.[2]
My conclusion is supported by the history, development, and commentary that have followed the rule since its creation. Florida's district courts of appeal were created effective July 1, 1957. Art. V, ง 5, Fla. Const. (1957). The en banc rule for use by Florida's district courts of appeal was not promulgated until 1979 and took effect January 1, 1980. In re Rule 9.331, Determination of Causes by a District Court of Appeal En Banc, Florida Rules of Appellate Procedure, 374 So.2d 992 (Fla. 1979) modified, 377 So.2d 700 (Fla.1979). At that time, the new rule was crafted carefully and explicitly. En banc sittings of the district courts of appeal were limited solely for the purpose of considering intra-district conflict. Id. at 992.[3] Before January 1, 1980, this authority resided in the Florida Supreme Court. See Art. V, ง 3(b)(3), Fla. Const. (1979)("JURISDICTION *789 โ The supreme court: . . . May review by certiorari any decision of a district court of appeal . . . that is in direct conflict with any district court of appeal or the supreme court on the same question of law. . . ."); see also In re Rule 9.331, 374 So.2d at 995 (Boyd, J., dissenting). As the new en banc rule was wending its way to final approval, the Judicial Council of Florida[4] proposed, and the Legislature in November 1979 placed on the ballot, a substantial revision to the jurisdiction of the Florida Supreme Court that included the elimination of intra-district conflict as a ground for jurisdiction in the Florida Supreme Court. See Judicial Council of Florida, Twenty-Fifth Annual Report 7-9 (1980). Adopted overwhelmingly by the voters in a special election held on March 11, 1980, the revision drastically curtailed the jurisdiction of the Florida Supreme Court. See Arthur J. England, et al, An Analysis of the 1980 Jurisdictional Amendment, 54 Fla. Bar J. 406 (1980). The express purpose of these changes was to curtail the Florida Supreme Court's review authority so as to ensure the "statewide importance of legal issues" resolved by that court. Arthur J. England, et al, Constitutional Jurisdiction of the Supreme Court of Florida: 1980 Reform, 32 Fla. L.Rev. 147, 161 (1980). It is thus clear from the historical record that the Supreme Court Appellate Commission and the Judicial Council of Florida were working in tandem, not only to reduce the Supreme Court's workload, but also in most instances to further solidify the district courts of appeal as the courts of last resort in their areas.
The responsibility of the district courts of appeal to set the law in their districts was reaffirmed just two years later in 1982 when the Florida Supreme Court was called upon by the Conference of District Court Judges to answer some practical operational questions that had arisen in the application of the recently adopted rule, namely whether one three-judge panel had the authority on its own to retreat from decisions of other panels on the same point of law and the number of judges needed to call an en banc hearing. Responding in the negative to the first question and holding that a majority of those actually participating was sufficient for the second, the court reflected as follows on the philosophical underpinnings of this state's appellate structure:
First and foremost, we must emphasize that a direct and important interrelationship exists between the en banc rule and the new [1980] constitutional amendment which limits Supreme Court jurisdiction. See [A]rt. V, ง 3, Fla. Const. The amendment substantially strengthened the position of the district courts of appeal as final appellate courts. The en banc rule is an essential part of the philosophy of the constitutional scheme embodied in the new amendment because the Supreme Court no longer has jurisdiction under the amendment to review intra-district conflict.
. . . .
[In adopting the new en banc rule], [t]his Court agreed with the [recommendation of the Supreme Court Appellate Structure] commission and concluded that an en banc rule as part of Florida's appellate structural scheme was appropriate and constitutional, particularly under the philosophy that the district courts should, to the extent possible, be final appellate courts.
. . . .

*790 [Thus], the view that one district court panel is independent of other panels on the same court . . . is totally inconsistent with the philosophy of a strong district court of appeal which possesses the responsibility to set the law within its district.
In re Rule 9.331, Determination of Causes by a District Court of Appeal En Banc, Florida Rules of Appellate Procedure, 416 So.2d 1127, 1127-28 (Fla.1982)(emphasis added). Two years later the Florida Supreme Court added to the rule the ability of the district courts of appeal to consider "cases . . . of exceptional importance." The Florida Bar Re: Rules of Appellate Procedure, 463 So.2d 1114, 1115 (Fla.1984). In this historical context, I find it unlikely that the Florida Supreme Court was thinking expansively, especially since just four years earlier it had rejected a proposed rule that would have on its face authorized the consideration by the district courts of appeal of "issues" of exceptional importance. See supra p. 788 n. 3. This conclusion is confirmed in my mind by the fact that from the date of adoption of the present appellate structure, the Florida Supreme Court has had the jurisdiction to consider matters of "great public importance", Art. V, ง 3(b)(4),[5] and invariably accepted jurisdiction of almost any question certified to it under this rule since 1957. See, e.g., Arthur J. England & Robert C. Williams, supra p. 790 n. 5, at 710 (noting that the justices of the Florida Supreme Court "generally respect the judgment of the district court judges as to whether a matter is sufficiently important to warrant review by the state's highest tribunal" and had not declined such a certification since the 1980 amendments took effect).
In addition, permitting en banc review merely because the case raises an issue of exceptional importance necessarily results in a host of jurisprudential problems. For example, condoning en banc review on this basis effectively empowers the district court to sit as a minor supreme court, providing a losing party the opportunity to target the forum โ the Florida Supreme Court, the District Court of Appeal sitting en banc, or both โ it believes will be more *791 sympathetic to its position.[6] Equally important, so construing Rule 9.331(d) fundamentally disrespects the decision of the people of this state in 1956 to establish the two-tier system of the courts that took effect on July 1, 1957. See supra, p. 788. See also Stein v. Darby, 134 So.2d 232, 236-37 (Fla.1961)("Having the view that the District Court of Appeal was exercising jurisdiction vested in it, when it gauged the order entered in this particular case, we desist from discussing the views of the District Court of Appeal anent the related problems with which that court struggled. To do so would, in our opinion, amount to encroaching on its territory."), overruled in part by Snedeker v. Vernmar, Ltd., 151 So.2d 439 (Fla.1968); Ansin v. Thurston, 101 So.2d 808, 810 (Fla.1958)("It was never intended that the district courts of appeal should be intermediate courts. . . . The . . . Supreme Court . . . functions as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice, with review by the district courts in most instances being final and absolute."); Jackson, 926 So.2d at 1265 (Fla.2006)(accord). Therefore, however enticed a district court of appeal may feel to take on a matter of statewide significance under Florida Rule of Appellate Procedure 9.331, either based upon a fancy of its own or at the undisciplined urging of a litigant, Rule 9.331 does not permit it to do so, it is not necessary to do so, and, more importantly, our proper role as judges counsels that we refuse. See Kirchgessner v. Wilentz, 884 F.Supp. 901, 912 (D.N.J.1995)("It seems that because of the separation of powers, the judiciary has to be self-policing in many respects.")(internal quotations omitted); Suja A. Thomas, Judicial Modesty and the Jury, 76 U. Colo. L.Rev. 767, 812 n. 209 (2005)("Such modesty by the judiciary may be appropriate when one considers that when the judiciary reviews its own power, no other branch may directly affect this interpretation.").
Based on the above analysis, as well as an examination of the role of Rule 9.331, I conclude we should consider en banc review only if: (1) the outcome of the case (or its notoriety) is of greater moment or impact within the community rather than its effect upon the law of the state, and either (a) the case is important beyond the effect it will have on the litigants or (b) will affect the ability of other potential litigants to seek their own remedies, or (2) the outcome of the case may reasonably and negatively influence the public's perception of the judiciary's ability to render meaningful justice.[7] Applying this reasoning to this case, there is no basis to grant Petitioner's motion for rehearing en banc. *792 While this case is no doubt of exceptional importance to the parties โ almost all cases are โ it is not a case of exceptional importance, legally speaking, in this court. Whether Respondents ultimately recover will not affect the ability of other potential litigants to seek their own remedies. Nor will our denial of Petitioner's petition today negatively influence the public's perception of the judiciary's ability to render meaningful justice.
Finally, there is no merit to Petitioner's alternate prayer that we certify this case as a Question of Great Public Importance under Article V, section 3(b)(4) of the Florida Constitution. Although I adhere to the reasoning set forth in my dissent in this case, no other court has squarely addressed the issue raised. It is not our prerogative to pass the buck to the supreme court anytime we are faced with an issue of first impression or of particularly difficulty. There are times when the issue raised is better vetted in other courts of appeal before being considered by a higher court. In my view, this is one of those times. See Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932)(Brandeis, J., dissenting)("[I]n most matters it is more important that the applicable rule of law be settled than that it be settled right.").
For these reasons, I join in the denial of Petitioner's Motion for Rehearing En Banc and/or Motion to Certify.
NOTES
[1] Because she was more than twenty-five years old at the time of her mother's death, it is questionable whether Wilson is a "survivor" within the meaning of the Wrongful Death Act for damage recovery purposes. ง 768.18, Fla. Stat. (2002)("Minor children means children under 25 years of age."); Henderson v. Ins. Co. of N. Am., 347 So.2d 690 (Fla. 4th DCA 1977)("[A]dult children of a decedent who are not dependent upon the decedent are not `survivors' under section 768.18(1)."). Salmon was twenty-two at the time of her mother's death.
[2] Under Section 733.301 of the Florida Statutes, the surviving spouse has the first preference in the granting of letters of administration. Next order of preference is "[t]he person selected by a majority in interest of the heirs." See ง 733.301, Fla. Stat. (2002).
[3] The majority takes offense for the daughters in this and a few other rhetorical flourishes in this dissent where I suggest the daughters โ more likely their trial counsel, in my view โ delayed filing a petition for administration of the estate for their own strategic and tactical reasons. Let me make explicit what I thought was implicitly obvious.

It is incontestable counsel for the daughters could have mooted the issue raised in this certiorari proceeding by the simple act of filing a Petition for Administration prior to attempting to commence pre-suit activities. ง 733.202, Fla. Stat. (2002)("Any interested person may petition for administration."). The record on appeal being devoid of any reason for the delay in this case, the majority seeks refuge in an uncorroborated, unsworn statement of counsel at oral argument that the daughters were looking for their father. Of course, the legal issue in this case does not turn on the reason for the delay. Rather, it is whether or not the daughters' delay has a legal consequence.
[4] Although the arbitration provisions of the Act are voluntary, there are substantial incentives built into them to encourage their use by all parties. See ง 766.207-212, Fla. Stat. (2002); see also Univ. of Miami v. Echarte, 618 So.2d 189 (Fla.1993)(holding constitutional sections 766.207 and 766.209 of the Florida statutes providing a monetary cap on non-economic damages in medical malpractice claims when a claimant seeks an early resolution and prompt payment through arbitration).
[5] The pre-suit investigation period can be extended "upon stipulation of the parties." ง 766.106(4), Fla. Stat (2002).
[6] In making its argument to the contrary, the majority places substantial reliance on Berges v. Infinity Ins. Co., 896 So.2d 665 (Fla.2004). However, unlike in our case, the settlement demand there was made by the decedent's husband, who not only had preference of appointment under the probate code, ง 733.601, Fla. Stat., but also already had engaged counsel and was in the process of having himself appointed as the personal representative of his wife's estate. In addition, Berges is not a medical malpractice case. See id. at 668. Cf. discussion of Ash v. Stella, 457 So.2d 1377 (Fla.1984), infra pp. 785-87.
[7] The statute read then, as it does today:

95.11 Limitations other than for the recovery of real property
* * * * * *3
(4) Within two years. โ
* * * * * *3
(d) An action for wrongful death.
[8] The majority seeks, belatedly in my view, to extricate itself from this legal principle by arguing that the University did, in fact, investigate and reject the medical malpractice claim made by the daughters in this case, thus waiving any right to a proper notice. See supra p. 780. A careful review of the passages of the majority opinion so urging reveals what a cursory review of the record demonstrates: there is nothing in the record to indicate what the University did in response to the receipt of the Notice of Intent to Sue. See supra p. 776 ("[T]he record and briefs are silent as to whether the University satisfied its obligations and whether it rejected the claim. . . . )." As a responsible medical facility, one can assume the University did not disregard the Notice. It is quite another matter to infer without any support in the record, as the majority does in this case, that the University engaged in the statutory pre-suit process, rejected the claim on the merits, and then disingenuously sought to defend the legal action that ultimately ensued on the strength of the failure of the plaintiffs to comply with the Act. If the argument were meritorious, I feel confident we would not see it for the first time in the majority opinion.
[1] In this, I do not mean to single out movant's counsel or imply that movant engaged in an egregious violation of the Rules of Appellate Procedure. Indeed, I believe that the appellate courts of this state have been at times similarly unchaste. See, e.g., Dozier v. Wild, 659 So.2d 1103 (Fla. 4th DCA 1995)("We grant rehearing [en banc] to correct the statement of facts and therefore substitute the following for our original opinion."); Slemp v. City of N. Miami, 515 So.2d 353, 354 (Fla. 3rd DCA 1987)(permitting en banc review to consider an alternative argument raised by appellee for affirmance). Nevertheless, cases such as this should provide a reminder to litigants that motions for rehearing en banc should be submitted only after careful consideration of merits of such a motion.
[2] In "law," a "case" is "[a]n action or suit or just grounds for an action." American Heritage Dictionary 244 (Houghton Mifflin Co., 2d ed.1985). A "decision" is defined as: "1. [t]he passing of judgment on an issue under consideration. 2. The act of reaching a conclusion or making up one's mind. 3. A conclusion or judgment reached or pronounced: verdict." Id. at 372.
[3] The rule was adopted upon the recommendation of the Florida Supreme Court Appellate Commission, a commission created in August 1978 by the Chief Justice of the Florida Supreme Court. The rule as proposed by the Commission also authorized the district courts of appeal to consider "questions of exceptional importance." Report of the Supreme Court Commission on the Florida Appellate Court Structure, 53 Fla. Bar J. 274, 279 (May 1979)(emphasis added). The Florida Supreme Court rejected this portion of the Commission recommendation. See In re Rule 9.331, 374 So.2d at 992.
[4] The Judicial Council of Florida was a statutory body charged at the time with recommending to the Legislature such changes in the "organization, jurisdiction and operation" of the Florida courts as may be required. See ง 43.15, Fla. Stat. (1953).
[5] When the first jurisdictional provisions as they would pertain to the Florida Supreme Court under the new constitutional arrangement became operational on July 1, 1957, this provision of the Florida Constitution authorized the Florida Supreme Court to consider any decision of a district court of appeal certified to be "of great public interest." Art. V, ง 4(2), Fla. Const. (1957). The word "importance" was substituted for the word "interest" in the proposed amendments adopted on March 11, 1980. Fla. S.J.R. 20-C (Spec.Sess.1979), reprinted in Arthur J. England & Richard C. Williams, Florida Appellate Reform: One Year Later, 54 Fla. Bar J. 704. The change expanded the reach of the rule. See In re Emergency Amendments to Rules of Procedure, 381 So.2d 1370, 1375 ("[t]he change was to recognize the fact that some legal issues may have `great public importance' but may not be sufficiently known to the public to have great public interest'"); see also Justice Ben F. Overton, Appellate Rules Amended to Implement New Jurisdiction, Fla. Bar News, Apr. 15, 1980, at 5 (accord). It would seem incongruous that the Florida Supreme Court intended during this period to both expand its own jurisdiction to hear cases of statewide importance and also authorize the district courts of appeal to have the same jurisdiction. See Raoul G. Cantero III, Appellate Law: Certifying Questions to the Florida Supreme Court: What's So Important?, 76 Fla. Bar J. 40, 40 (2002)("It also seems self-evident that an issue of `great public importance' must mean importance throughout the state, not just in a single geographic area. . . . [I]ssues which arguably may be of `great public importance,' but nevertheless are limited in their reach to the jurisdiction of a particular appellate district, are more appropriate for en banc consideration by that district court than for certification to the Florida Supreme Court.").
[6] Worse yet, while litigants in a more restrictive jurisprudential regime might hesitate to file further appeals based on the increasing narrowness of review, see, e.g., Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 530 (Fla. 1995)("As a case such as this travels up the ladder, review should consistently become narrower, not broader."), litigants operating in the more forgiving regime proffered by Petitioners might consider themselves more disposed to gamble on continuous review "up the judicial ladder." The casualty in such a circumstance is, of course, finality.
[7] Examples of cases that might fall within these parameters include: (1) an electoral tabulation dispute where the electoral boundaries are solely within the jurisdiction of a district court of appeal as distinguished from a dispute where the boundaries cross district lines; (2) an environmental dispute of local significance; and (3) a criminal proceeding where the accused is a recognizable figure in the local community and the panel's decision may create a reasonable belief by the public that the judiciary was not acting impartially.