24 So.3d 596 (2009)
Emmanuel ORTIZ, Appellant,
v.
STATE of Florida, Appellee.
No. 5D08-1653.
District Court of Appeal of Florida, Fifth District.
November 13, 2009.
*597 Frances Martinez, of Escobar, Ramirez & Associates, P.A., Tampa, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Mary G. Jolley, Assistant Attorney General, Daytona Beach, for Appellee.

ON MOTION FOR REHEARING EN BANC
MONACO, C.J.
We grant the motion for rehearing en banc requested by the State, withdraw our previously issued opinion, and substitute for it the following.
This case causes us to consider the parameters of the exigent circumstances doctrine as applied to a police officer's discovery of proscribed substances incident to an attempt to fulfill his non-investigative obligations. Because we conclude, as did the trial judge, that the officer acted reasonably under the circumstances in entering the home of the appellant, Emmanuel Ortiz, without a warrant, we affirm.

I. Rehearing En Banc.
A rehearing en banc may be granted pursuant to Florida Rule of Appellate Procedure 9.331(a) when the case is of exceptional importance or in order to maintain uniformity in the court's decisions. First, we note that the present case fleshes out the borders of both the "feared medical emergency" exception to the warrant requirement articulated by the Florida Supreme Court in Riggs v. State, 918 So.2d 274 (Fla.2005), and the now well-recognized community caretaking function of police officers. Unlike the dissent, we view both issues to be of exceptional importance, particularly in a day and age where society expects police officers to be deeply involved in humanitarian and life and property protection actions that go beyond traditional law enforcement duties. Underscoring this concept, the Riggs court quoted the United States Court of Appeals for the First Circuit to the effect that police officers fearing emergencies:
need [to make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences.
Riggs, 918 So.2d at 282 (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir.), cert. denied, 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005)). Because the view of the original panel decision had potentially far-reaching negative effects on the actions of law-enforcement officers in fulfilling this function, the case is exceptionally important.
Finally, while the dissent asserts that the original panel decision did not conflict with Riggs, the majority has concluded otherwise. Indeed, Riggs compels a conclusion far different than that dictated by the original decision. Accordingly, we review this case en banc.

*598 II. Adjudicative Facts.
Mr. Ortiz pled nolo contendere to trafficking in cocaine and possession of drug paraphernalia, reserving the right to appeal the denial of his dispositive motion to suppress. He argues that a law enforcement officer's warrantless entry into his home and the subsequent seizure of cocaine and drug paraphernalia were unconstitutional. We disagree.
At about 6:30 p.m. one evening, Sheriff's Deputy Herbert Mercado received a call from a local elementary school reporting that a six-year-old child's parents failed to pick him up from an after-school program. The deputy indicated that he routinely received such calls, and in such instances "we usually exhaust our means to make contact" with the parents of the child before referring the child to the Department of Children and Families.
The school's representative advised the deputy that the child was supposed to be picked up by 6:00, and that the school had been unable to contact the child's parents by telephone. Because of the Sheriff's office's policy to take reasonable steps to contact parents before turning a child over to the Department of Children and Families, Deputy Mercado proceeded to the school, and then drove the child to the address that the school provided as the child's home. The deputy testified that the child told him that his parents were or should be home.
When the deputy and the child arrived at the house, the house appeared to be dark and it did not appear that anyone was home. From his vantage point in the street the officer was able to see no lights in the house, and no one answered when the child knocked on the front door. There was no car outside and nothing was obviously amiss. When the child received no response from his knocking on the front door, the child proceeded to the garage. The front garage door was not locked, and the child opened it, possibly with the deputy's help.[1] From inside the garage, the deputy could now see a light on in the house. The child invited the deputy inside the home, saying "Come in. I'll show you where my parents are." The deputy and the child then entered the house in search of the parents. According to the deputy, "He (the child) basically just kind of walked randomly into the house, just looking for the parents. So I just, you know, followed him." Immediately before entering the house, the deputy announced his presence, but got no response. After they looked around without finding anyone, the child took the deputy to the locked door of his parents' bedroom. Oddly enough, the bedroom door was locked from the inside. The deputy knocked on the bedroom door and announced his presence. There was no answer. The time was now about 7:30, and no contact had yet been made with the child's parents.
Concerned for the well-being of the parents, the deputy was able to unlock the door and enter the bedroom, possibly because "it had like a pinhole kind of way you can stick a pin in it and open it." In any event, the deputy did not force the door open. Once in the bedroom, the deputy, still fearing for the health of the parents, looked "for a body" on and under the bed, as well as in the closets. When the deputy walked into the adjoining bathroom, however, he saw in plain view what turned out to be 34 grams of cocaine wrapped in baggies on the countertop. Moments later, Mr. Ortiz entered the room.
*599 The deputy asked him if he lived in the house and if the young boy was his son. After Mr. Ortiz answered both questions affirmatively, the deputy advised him of his Miranda[2] rights. Mr. Ortiz then admitted that the cocaine was his, and was subsequently arrested on several drug-related charges.
Mr. Ortiz moved to suppress the cocaine, contending that contrary to the State's position, exigent circumstances did not justify a warrantless entry into his home, and specifically, the locked bedroom. He also argued that the six-year-old child did not have the authority to consent to the warrantless entry into the house. The trial court disagreed, explaining in part:
As far as going inside the bedroom, I think that's key here, because if  it doesn't matter what consent may have  given, what understanding there was by the defendant. If the officers did not have the right to be where they were, then the evidence has to be suppressed. That's why I was very clear in asking what was not clear from the questioning, whether or not  in order to get to the bathroom where the contraband was found, whether or not the only access was through the bedroom door.
You know, again, when you look at the situation that we have here, when the child is directing  I think what's critical here, that may be missing from other cases, is that you've got the child directing the officer to the bedroom of the parents, where the parents are, or where the child believes the parents would be or might be. And I believe that where he was, under the circumstances that he was  that he was in, the fact is also critical that there was no busting down of the door, but that a pick or a  whatever it was, to unlock the door, was used, I think it was reasonable within the context of the facts of the entire case.
So I do not believe at this point, that we are within  with the facts  within the facts that Wheeler [v. State, 956 So.2d 517 (Fla. 2d DCA 2007)] provides. And I do believe that this is, again, because we are dealing with a child; we are dealing with a child having the apparent authority.
This is not the, my child is letting a complete stranger inside the house, but my child is letting a law enforcement officer who has been verified by the school board, in whose trust, care and custody the child has been placed  to reunite him with a parent. And I think, under the circumstances here, it is totally, completely reasonable, particularly since there was no violent  or destruction of property to get access.
There is absolutely nothing but clear, unambiguous, good intentions on the part of the police officer, to make sure that a child is returned to his family. And but for the fact that these items were left in plain view, I think the officer had every reasonable expectation from our society to make sure that somebody was not, where the child indicated a parent might have been, in extremis.
So, for the reasons that have been stated, I believe that the officer acted reasonably and that this was not an unwarranted search or seizure of either the property or the  the search of the property or seizure of contraband. The motion, at this time, is denied for the reasons stated.
Mr. Ortiz subsequently entered a plea of nolo contendere to trafficking in cocaine and possession of drug paraphernalia, expressly *600 reserving his right to appeal the denial of his dispositive motion to suppress evidence.

III. Analysis.
Review of a motion to suppress is a mixed question of law and fact. The standard of review applicable to the factual findings is whether competent substantial evidence supports those findings. The standard of review applicable to the trial court's application of the law to the factual findings is de novo. Tyson v. State, 922 So.2d 338, 339 (Fla. 5th DCA 2006) (citing McMaster v. State, 780 So.2d 1026, 1028 (Fla. 5th DCA 2001)).
A warrantless search of a home is initially presumed to be unreasonable, and thus, impermissible under the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The presumption, however, is not deemed to be absolute or without flexibility. United States v. McGough, 412 F.3d 1232, 1237 (11th Cir. 2005). Thus, because the keystone of a Fourth Amendment analysis is "reasonableness," the warrant requirement is subject to certain important exceptions. Flippo v. West Virginia, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). One of the recognized and emerging exceptions to the warrant requirement comes into play when a law enforcement officer is confronted with exigent circumstances.
In this regard we have come to recognize over the years that police officers frequently perform functions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." See Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The United States Supreme Court has referred to this series of duties as "community caretaking functions." Caretaking functions are performed by police officers because we expect them to take those steps that are necessary to "ensure the safety and welfare of the citizenry at large." 3 LaFave, Search & Seizure (4th Ed. 2004), § 5.4(c), pp. 201-202. See also United States v. Quezada, 448 F.3d 1005 (8th Cir. 2006). Searches undertaken by a law enforcement officer in fulfilling his or her community caretaking functions focus on "concern for the safety of the general public." See Dombrowski, 413 U.S. at 447, 93 S.Ct. 2523; Castella v. State, 959 So.2d 1285, 1292 (Fla. 4th DCA), review denied, 968 So.2d 556 (Fla.2007). Indeed, courts have traced the derivation of the emergency doctrine that we apply today to the recognized community caretaking function of law enforcement officers. See, e.g., United States v. Russell, 436 F.3d 1086, 1090 (9th Cir.2006); United States v. Bradley, 321 F.3d 1212, 1214 (9th Cir. 2003).
One exigency that obviates the need for a warrant occurs when an officer is put in position to assist persons who are injured or threatened with injury. Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Our courts have deemed it reasonable under such circumstances to forego the wait for a warrant. In Riggs, 918 So.2d at 278-79, the Florida Supreme Court had the opportunity to apply and discuss this exception in a case that guides our consideration of the present case.
In Riggs, a child was found wandering naked and alone in the early morning hours. The child was in the company of local residents when the police arrived. The deputies, acting in their caretaking capacity, decided to search a nearby apartment complex because they were concerned *601 about the "welfare of the parents" and about "any type of child abandonment or anything like that." Riggs, 918 So.2d at 276. The officers found a door to one apartment "slightly ajar," and conjectured that "that was possibly where the child had come out of." The officers pounded on the door, but got no answer. Id. at 276-77. Because they were concerned that something might have happened to the child's caregiver, or that someone inside might need medical attention, the deputies entered the apartment. Id. at 277. There were three rooms in the apartment. Id. In the first they found nothing out of the ordinary. In the second they found seven potted marijuana plants and a fluorescent light suspended above them. Id. In the third they found Mr. Riggs and the child's babysitter. The trial judge suppressed the evidence, concluding that there were no exigent circumstances. The Second District disagreed and noted that "[t]he officers believed it was their duty to see that the child's caregiver was not incapacitated and justifiably entered the residence." State v. Riggs, 890 So.2d 465, 467-68 (Fla. 2d DCA 2004). Our supreme court unanimously affirmed the district court, and held that "in entering Riggs's apartment without a warrant, the deputies acted reasonably and consistent with the Fourth Amendment." Riggs, 918 So.2d at 283.
Jurisdiction in Riggs was based upon conflict with the decision of the First District in Eason v. State, 546 So.2d 57 (Fla. 1st DCA 1989). In Eason an eight-year-old child was found wandering through an apartment complex about 8 a.m. The officers followed the boy to a specific apartment. The child pointed to a partially opened door and said, "Mommy's in there," or something to that effect. After the officers knocked and got no reply, they entered the apartment and found the boy's caretakers in a room containing marijuana and drug paraphernalia. The trial court found the search to be lawful, but the district court reversed, saying:
[The officer] admitted that prior to entering Eason's apartment he saw no evidence that the child had been, or was going to be, physically or mentally abused, saw no evidence that medical intervention was necessary, and saw no evidence of a murder or robbery. [He] also testified that, upon his arrival at the apartment complex, the child appeared to be in the care of a responsible adult. We must conclude, therefore, that the state did not satisfy its burden of proving that the officers had reasonable grounds to believe exigent circumstances existed.
Id. at 58-59. The Florida Supreme Court granted review because the Second District in Riggs applied a "rule of law to produce a different result in a case which involves the same facts as a prior case." Riggs, 918 So.2d at 278 (quoting Mancini v. State, 312 So.2d 732, 733 (Fla.1975)). The high court approved the decision of the Second District in Riggs to the effect that the seized evidence should not have been suppressed, and disapproved Eason. Riggs, 918 So.2d at 283.
Our supreme court reached this conclusion based on a permutation of the doctrine of exigent circumstances; namely, "a feared medical emergency." Riggs, 918 So.2d at 279. This variety of exigency is founded in two United States Supreme Court cases, Mincey, and Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). Mincey describes the doctrine succinctly:
Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person *602 within is in need of immediate aid.... "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."
Mincey, 437 U.S. at 392, 98 S.Ct. 2408 (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir.), cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963)).
In applying the feared medical emergency exception in Riggs the Florida Supreme Court posed and answered two critical questions. First, whether the deputies had reasonable grounds to believe that the child's caregiver might be in need of medical attention. The court answered that question affirmatively. Next, the court asked whether the deputies had reasonable grounds to connect the feared emergency to the apartment they entered. Once again, the high court answered affirmatively.
In its analysis of the exigency exception the court rejected the suggestion that the deputies should have simply walked away from the open door, stating "[g]iven their reasonable fear of a medical emergency, the deputies did not have time to retreat and weigh their options." Riggs, 918 So.2d at 282. The court added:
As the First Circuit recently explained, officers fearing emergencies often "need [to make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences." See United States v. Martins, 413 F.3d 139, 147 (1st Cir.2005), cert. denied, 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005). The deputies in this case made precisely such a judgment. The resulting invasion of privacy is one that prudent, law-abiding citizens can accept as the fair and necessary price of having the police available as a safety net in emergencies.
Id., at 282-83.
The identical principles obtained in the present case are demonstrated by a consideration here of the same two inquiries suggested by Riggs.
A. Whether the officer had reasonable grounds to believe that the child's parents might be in need of medical attention.
The officer was fulfilling a laudable police function in attempting to reunite the child with his missing parents. He was not, it should be noted, acting to investigate and uncover a crime. We give weight to the fact that a proper function of the officer in these circumstances was to attempt to reunite the child with his parents, much as the supreme court implicitly did in Riggs.
Although the dissent concludes that there was no reason to believe that the parents were in the house and in possible need of medical or other assistance, we find ourselves in sharp disagreement with that proposition. At the time that' the officer reached the house, the child indicated that his parents were inside and knocked on the door. When there was no answer forthcoming, the child led the officer to the unlocked garage door and either with or without the officer's assistance, lifted the garage door. The officer could see a light on in the house, indicating that someone might be home, yet no one responded. Although the transcript does not say specifically, it appears that the child, followed by the officer, then entered the house through an unlocked door from the garage.
Had the officer acted unreasonably up to this point? We think not. Certainly the officer would reasonably conclude based on the historical facts and the inferences that *603 would logically be drawn from them that something was not right, and that prudence would dictate that he follow the child into the home. He knew that the parents were quite late in picking up the child at the school and could not be reached by phone. At 7:30 p.m., an hour and a half after the child was first supposed to be picked up by his parents, the officer found himself with the child in the unlocked garage of the child's home, and he could see a light on in the unlocked house. Still, no one responded to his knock. Viewing these facts objectively, could the officer reasonably conclude that something was wrong? We and the trial judge, who considered the live testimony presented, agree that the answer to this inquiry is, yes.
Upon entering the house, still having charge of the child, the officer still saw no sign of the parents. Although the child indicated that his parents were likely in the bedroom, the officer found that the bedroom door was locked from the inside, and there was no response to his knock or announcement. At every incremental stage of this evolving scenario the officer reasonably followed his instincts leading him to the conclusion that there could well be a medical emergency under way or worse. Upon entering the bedroom, the officer said, in fact, that he searched for a body. Instead he found the drugs in plain view. There was nothing unreasonable about the officer's behavior or his apprehensions that he was dealing with an emergent situation that demanded prompt action.
In this regard the trial judge specifically found that:
There is absolutely nothing but clear, unambiguous, good intentions on the part of the police officer, to make sure that a child is returned to his family. And but for the fact that these items were left in plain view, I think the officer had every reasonable expectation from our society to make sure that somebody was not, where the child indicated a parent might have been, in extremis.
We agree.
B. Whether the officer had reasonable grounds to connect the feared emergency to the house that was entered.
This is easily acknowledged. All of the evidence pointed to the Ortiz residence as the site of the feared medical emergency.

IV. Conclusion.
In the final analysis, our consideration of this case requires us to balance two values that are important to all of us: our desire to have police officers perform the community caretaking function particularly in perceived emergent circumstances, and the warrant requirement to underpin a search. As one noted observer has put it in a different constitutional context, "[t]he issue always is a comparison of the harm done by a marginal curtailment of one value with the benefit to another value from the curtailment." R. Posner, How Judges Think, Harvard University Press 330 (2008). Here, the benefit obtained by allowing officers to act without a warrant in perceived emergency situations must trump the marginal curtailment of the warrant requirement. This case does not present a new exception, nor does it diminish the respect for the sanctity of the home. Rather, it simply adheres to the holding of our supreme court in Riggs, and applies a recognized exception to the warrant requirement.
AFFIRMED.
GRIFFIN, SAWAYA, PALMER, TORPY and JACOBUS, JJ., concur.
*604 TORPY, J., concurs and concurs specially, with opinion in which LAWSON, J., concurs.
LAWSON, J., concurs in result and concurs specially.
ORFINGER, J., dissents, with opinion in which COHEN, J., concurs.
EVANDER, J., dissents, with opinion in which ORFINGER, J., concurs.
COHEN, J., dissents, with opinion in which ORFINGER, J., concurs.
TORPY, J., concurring and concurring specially.
In my view, this case should not be analyzed using many of the Fourth Amendment concepts identified by my colleagues in their opinions because these concepts pertain only to searches for evidence of crime. The purpose for a search warrant is to ensure that "conclusions as to probable cause will be drawn by a neutral magistrate unrelated to the criminal investigative-enforcement process." South Dakota v. Opperman, 428 U.S. 364, 371 n. 5, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). "Probable cause" is a concept that is confined to criminal investigations. Id. When a warrant would not serve this prophylactic purpose, it is inapplicable. Id. Indeed, a search warrant is not available unless police are searching for criminals, evidence of crimes, instruments of crimes, fruits of crimes or contraband. § 933.14, Fla. Stat. (2007), see also Fed.R.Crim.P. 41(c) (warrant may issue for evidence, fruits or instruments of crime, contraband or persons to be arrested for crime). Here, the decision to search was not to discover evidence of a crime at all. Thus, the presumption of unreasonableness associated with warrantless searches, acknowledged by the majority and argued by Judge Orfinger, is not applicable, because this is not a case where a warrant would have been applicable or even available. It makes no sense that there should exist a presumption of unreasonableness because police did not procure that which is inapplicable and unattainable.
The phrase "exigent circumstances," likewise pertains to searches in criminal investigations. It is said to be an "exception to the warrant requirement," predicated on the impracticability of first obtaining a warrant. G.M. Leasing Corp. v. United States, 429 U.S. 338, 339, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (emphasis added). The existence of such exigent circumstances does not obviate the need for "probable cause" to search, however. It only excuses the step of first obtaining judicial authority to conduct the search. Anderson v. Creighton, 483 U.S. 635, 657, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, although courts sometimes employ this rhetoric in the context of searches in noncriminal cases, it is a jurisprudential concept that simply does not fit in cases such as this one. Whether an "exigency" existed, so as to excuse the precaution of prior independent review of "probable cause" and the issuance of a warrant to search for criminals or evidence, is not the issue.
There may be many occasions where noncriminal searches are precipitated by "exigent circumstances," but the finding that a true exigency exists should not be a requisite finding to the conclusion that a search of this nature meets the reasonableness standard of the Fourth Amendment. This seems to be a central point of departure between the majority and dissenting opinions. All seem to agree that the police acted reasonably, but the majority concludes that an exigency existed, while the dissenting judges do not. Although I agree with the conclusion of the majority on this issue, I admit that the point is fairly debatable, depending on how one defines and views "exigent circumstances." *605 See Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (equating "exigent circumstances" with "emergency"). I think the debate is unnecessary, however, because the relevant inquiry simply should be whether the police acted reasonably under the circumstances, which is the "ultimate standard" under the Fourth Amendment. Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).[3]
On this issue, at our level of review, we must afford deference to the inferences drawn by the police and the trial judge. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In other words, when multiple reasonable inferences may be drawn from the same set of circumstances, it is not our function to determine which inference is most probable or most reasonable. Instead, we must determine, after all inferences are considered from the vantage point of a reasonable police officer, whether this officer acted reasonably under these circumstances. Id.
Here, there is no contention that the police officer acted in bad faith or with an ulterior motive. The goal of attempting to reunite this young child with his parents was legitimate and one that we as a society should foster. At each juncture, the officer learned additional information that justifiably led him to conclude that something was amiss. By the time the officer entered the house, the parents were seriously overdue in picking up the young child at a late hour. It is not likely that a parent would forget to pick up a child of this age at this time of day, for this period of time. And, in this day where everyone has access to a cellular phone, one would expect at least a phone call from a tardy parent if the parent was merely unavoidably detained. One could deduce from these facts alone that something was wrong.
The fact that the boy believed his parents were home is also significant. Although he had not been home all day, he could no doubt make a reasonable prediction that his parents were home, just as any family member could predict the location of loved ones based upon the time of day, knowledge of their habits and other circumstances. When neither parent answered the door, although other reasonable inferences might have been drawn, it was not unreasonable to conclude that the parents were in danger. This conclusion was buttressed by the fact that the door to the bedroom was locked from the inside, justifying the further intrusion into the inner sanctum of the home.
Even if the officer was not reasonable in his belief that the parents were in danger, he was still duty-bound to protect the child. That duty justified taking the child to the home and, when unable to get the parents to come to the door, further justified the entry into the home to see if the parents were in fact there. The officer's only other options were to leave the child at the home without verifying that a parent was home or to place the child with the Department of Children and Families. These options would have left him in a potentially "no-win" situation. Had he believed the child when he said his parents were home and simply left him in the residence without further investigation, the risk was that a six-year-old child might be left alone with no supervision. Had the officer turned the child over to the Department *606 of Children and Families, he would run the risk of unnecessarily subjecting him to the emotional trauma of being left in an unfamiliar place with total strangers, should it later turn out that his parents were in fact home, but simply did not hear the knock at the door. If the boy suffered harm in either hypothetical circumstance, the police would surely be criticized and maybe even sued.[4]
The choice that the officer made  to confirm whether a parent was home by entering the premises  was the most reasonable choice under the circumstances, when viewed from the perspective of a reasonable officer. Even if it was not the most reasonable choice, however, it was not an unreasonable one. The importance of the goal of reuniting this young child with his parents in an expeditious and informal way cannot be overstated. The alternative of turning the child over to another governmental agency, with the concomitant reports, procedures, investigations and disruption to both the child and parents, would probably be considerably more intrusive than the brief entry into the home. It was reasonable for the officer to assume that most parents, innocent of wrongdoing, would prefer this minimal intrusion into their privacy over the hardship, disruption and intrusion to their family of having the child placed in the official custody of the government. See Florida v. Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("reasonable person" test presupposes an innocent person).
Whether the so-called "community caretaker doctrine" applies in this case is not critical to my conclusion. In my view, reasonableness is the ending point of any Fourth Amendment analysis. When a search is criminal in purpose, a finding of reasonableness involves a determination of whether probable cause existed and, if the search was warrantless, whether judicially developed warrant exceptions apply. When a search is noncriminal in purpose, however, criminal concepts are not helpful in making the determination of reasonableness.
I nevertheless disagree with the views of my dissenting colleagues who would disapprove of the application of the community caretaker doctrine in the context of a residential search. I acknowledge that the Court in Cady discussed the distinction between vehicles and residences. That is because there were two issues in Cady  the first of which was whether the search was unreasonable "solely because the ... officer had not previously obtained a warrant." 413 U.S. at 442, 93 S.Ct. 2523. This issue involved the application of the "automobile exception," which was originally predicated on the impracticability of obtaining a warrant due to the inherent mobility of an automobile. Arguably, in Cady, the exception was not applicable because Cady's car had already been impounded before the search was conducted. Concluding that mobility was not the sole justification for warrantless searches of automobiles, and drawing a distinction between dwellings and vehicles insofar as privacy expectations are concerned, the Court answered the first question in the negative. Id. at 446, 93 S.Ct. 2523.
The second issue in Cady was whether the search was otherwise unreasonable under the Fourth and Fourteenth Amendments because it was conducted without probable cause. Id. The sole purpose for the search in Cady was to take custody of a firearm for the protection of the public *607 against the possibility that the gun would fall into the wrong hands. There was no contention that the firearm was evidence, fruits or instruments of a crime or that it was contraband. Thus, the question was whether police may search without probable cause for the sole purpose of fulfilling their "caretaking" function. The Court's discussion of the distinction between vehicles and residences was not relevant to its holding on this issue. It simply held that, in searches of this type, unless police act "unreasonably," the search will withstand Fourth Amendment scrutiny. Id. at 448, 93 S.Ct. 2523. Indeed, Cady does not compel, and there is no logical basis for, a distinction between vehicles and residences for purposes of assessing whether police acted reasonably in conducting a noncriminal search under their caretaking function. In our complex society, police are charged with the duty to protect people and property, wherever they are situated, under a variety of circumstances.[5] Surely, the caretaking function of police may appropriately involve intrusions into both conveyances and structures, whether or not a true emergency exists.[6]
One situation where the police perform the caretaking function involving the possible intrusion into residences is the so-called "well-being checks." In Wallace v. Dean, 3 So.3d 1035 (Fla.2009), for example, deputies were called upon to check on a mother whose out-of-state daughter had become concerned because she had been unable to reach her mother by telephone throughout the day. Deputies responded and decided to enter the house through an unlocked window. Id. at 1043. Once inside, they discovered the woman in an unconscious state. Id. Although there was no Fourth Amendment issue in that civil case, it illustrates a scenario where police, under the caretaking function, assume a duty to investigate and enter a residence even when they might not have enough information to have "probable cause" that an "emergency" exists.
Well-being checks, such as the one in Wallace, involving warrantless entry into a private residence, present Fourth Amendment questions similar to those presented here: Does the community "caretaking doctrine" apply to an intrusion of this nature? If not, are the police authorized to enter residential premises when they have only a suspicion that someone might be in distress, or do they need "probable cause?" When the police are in doubt about their authority, should they resolve that doubt by pursuing the course of action that places a higher priority on the well-being of persons than on individual privacy? To me, the answers are obvious. Provided *608 that the police proceed in good faith, limit the intrusion to that which is minimally necessary to fulfill the purpose for the intrusion, and otherwise act reasonably, the letter and spirit of the Fourth Amendment are fulfilled, and any evidence or contraband discovered in plain view during such an intrusion should not be excluded.
In any event, this is clearly not a case where the application of the exclusionary rule is appropriate. The purpose of the exclusionary rule is to deter police misconduct. United States v. Leon, 468 U.S. 897, 918, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The motives of the police officer in this case were genuine and he acted within the scope of his duties as a caretaker of the public. I fail to see how the application of the exclusionary rule in this case would serve to deter police and preserve the protections of the Fourth Amendment. Id. (exclusionary rule applicable "only in those unusual cases in which exclusion will further the purposes of the exclusionary rule"). See Herring v. United States, ___ U.S. ___, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it.... [E]xclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").
LAWSON, J., concurs.
LAWSON, J., concurring in result and specially concurring.
Although Riggs v. State, 918 So.2d 274 (Fla.2005), and most other cases, appear to dictate that we analyze this case in terms of exceptions to a warrant requirement, I fully agree with Judge Torpy that this makes no sense in a case where law enforcement is simply trying to reunite a child with his or her parents and is not looking for evidence of a crime. Therefore, I concur in Judge Torpy's specially concurring opinion and fully adopt the well-reasoned analysis of his opinion. Unlike Judge Torpy, however, I cannot concur in the full majority opinion. In my view, the rather narrow legal requirements for application of the feared medical emergency exception to the warrant requirement cannot justify Deputy Mercado's initial intrusion into Ortiz's home because there was insufficient evidence suggesting that a medical emergency existed in the house at the outset.
Nevertheless, following Riggs and applying the traditional warrant requirement exception analysis, as it appears we are required to do, I still concur in the result reached by the majority based upon the trial court's finding that the child consented to the deputy's initial entry into the home.[7]
And, I agree with the majority that the additional facts discovered by Deputy Mercado during and after his initial entry into the home were sufficient to justify the deputy's entry into the bedroom under the feared medical emergency exception.
With respect to the initial entry, the conclusion that this six-year-old child possessed the capacity, intelligence and authority to consent to the officer's entry into the common areas of the home is admittedly a close call. But, the trial court's findings on this issue are supported by competent, substantial evidence, and are consistent with legal precedent.
Factually, it is undisputed that the child invited Deputy Mercado inside. Legally, a *609 minor can validly consent to the warrantless entry into a home shared with his or her parent if the State establishes that: (1) the minor shares the home with an absent, non-consenting parent; (2) the police officer entering the home reasonably believes, based on articulable facts, that the minor shares common authority with the parent to allow the entry; and (3) by clear and convincing evidence, the minor's consent was freely and voluntarily given under the totality of the circumstances. Saavedra v. State, 622 So.2d 952, 954 (Fla.1993).
There appears to be no dispute that the child shared the home with his parents or that the child's consent was freely and voluntarily given. In fact, there is no evidence that the deputy even hinted that the pair should enter the home. Rather, it was solely the child's suggestion (coupled with his insistence that his parents were there, despite the deputy's initial observations suggesting that no one was home) that prompted the deputy to follow the child into the house.
With respect to the second criteria, the fact that the child invited the deputy inside, with no hesitation or prompting whatsoever, along with the fact that the child knew how to gain entry into the house when it appeared to be empty and secured, were articulated facts sufficient to support the deputy's reasonable belief that the child shared common authority with his parents to allow entry into the home. See Georgia v. Randolph, 547 U.S. 103, 111, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) ("[A] child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman might well be admitted," 4 Wayne R. LaFave, Search and Seizure § 8.4(c), at 207 (4th ed. 2004), but no one would reasonably expect such a child to be in a position to authorize any-one to rummage through his parents' bedroom.)
In determining a child's authority to consent, the "primary factors to be considered are the child's age, intelligence, and maturity, and the scope of the search ... to which the child consents." State v. Tomlinson, 254 Wis.2d 502, 648 N.W.2d 367, 377 (2002) (citing 3 Wayne R. LaFave, Search and Seizure § 8.4(c), at 773-74 (3d ed. 1996)) (emphasis added). In addition to the articulated facts already outlined, I believe it highly significant that the consent in this case was limited in scope to a search for the child's parents. In short, I am simply unprepared to find that a six-year-old child can never validly consent to a police officer's entry into his or her home for any purpose, as a matter of law. And, I believe that it would take that kind of holding, in this case, to overcome the trial court's factual finding on this issue.
I also note that the original panel did not find fault with the trial court's determination that the child validly consented to the officer's entry into the common areas of the home. Rather, the panel correctly concluded that the child's consent was legally insufficient to justify entry into the parents' bedroom. Randolph, 547 U.S. at 111, 126 S.Ct. 1515; Ortiz v. State, 34 Fla. L. Weekly D829 (Fla. 5th DCA Apr. 24, 2009).
After the initial entry based on consent, I agree with the majority that the totality of the circumstances which led Deputy Mercado to subjectively fear for the safety of whoever might be on the other side of the locked bedroom door were objectively sufficient to trigger the feared medical emergency exception. These facts included the parents' failure to pick the child up from school and the school's inability to locate them, the child's insistence that his parents were home, the child's ability to enter the home through an unlocked door, *610 the illuminated interior light (not initially visible from outside the home), and the fact that the bedroom door was locked from inside the bedroom.
ORFINGER, J., dissenting.
"The Fourth Amendment to the United States Constitution has drawn a firm line at the entrance to the home, and thus, the police need both probable cause to either arrest or search and exigent circumstances to justify a nonconsensual warrantless intrusion into private premises." Kirk v. Louisiana, 536 U.S. 635, 637, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002). That line is far less firm now that the majority has created a "tardy parent" exception to the Fourth Amendment. This new exception to the Constitution's prohibition against governmental intrusions into protected places seemingly would apply anytime a parent is late picking up a child from school, daycare or a babysitter and cannot be reached by telephone, and would permit the police to search the parent's home to determine if the parent is home and might need medical attention. The majority's view significantly diminishes the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Consequently, I must respectfully dissent.
"[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" stands "[a]t the very core" of the Fourth Amendment. Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). A warrantless search of a home is presumptively unreasonable, and thus, unconstitutional under the Fourth Amendment. Coolidge, 403 U.S. at 454-55, 91 S.Ct. 2022. However here, because the police were not investigating a crime or searching for evidence when they entered Ortiz's home, one might reasonably ask if the Fourth Amendment is implicated at all. Under the Fourth Amendment, a person enjoys the highest reasonable expectation of privacy in his or her private home. See, e.g., Payton, 445 U.S. at 585, 100 S.Ct. 1371. A "search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Consequently, I believe that although Deputy Mercado was not investigating a crime, his entry into the Ortiz home is properly analyzed using Fourth Amendment principles. "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31, 121 S.Ct. 2038; see Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). One of the recognized exceptions to the warrant requirement exists when law enforcement is confronted with exigent circumstances or some other emergency situation. The terms exigent circumstances, community caretaking and the emergency aid doctrine, all recognized exceptions to the warrant requirement of the Fourth Amendment, are closely related, and courts do not always clearly distinguish between them. See Matthew Bell, Fourth Amendment Reasonableness: Why Utah Courts Should Embrace the Community Caretaking Exception to the Warrant Requirement, 10 Boalt J.Crim. L. 3, 5 (Dec. 2005). As Payton makes clear, as a general rule, the police need either a warrant or probable cause and exigent circumstances in order to make a lawful entry into a home. See also Kirk, 536 U.S. at 638, 122 S.Ct. 2458. Probable cause to search exists when there is a "fair probability that contraband or evidence of a crime will be found." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d *611 527 (1983). However, an exigent circumstances analysis is appropriate only when the police act in a criminal investigative capacity. People v. Ray, 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 936-37 (1999). In other emergency situations, the police must have an objectively reasonable belief that someone or something, such as a fire, requires immediate attention inside the premises to be entered. To overcome the presumption of unconstitutionality, the government must demonstrate that a grave emergency makes a warrantless entry imperative for the safety of the police or the community. McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); see also Rodriguez, 497 U.S. at 191-92, 110 S.Ct. 2793 (Marshall, J., dissenting).
In Riggs, the Florida Supreme Court explained the warrant requirement and the emergency aid exception, observing:
The United States Supreme Court has repeatedly identified "physical entry of the home [as] the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Throughout the Supreme Court's caselaw, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590, 100 S.Ct. 1371. As the preceding sentence suggests, however, a well-established exception exists for "the sort of emergency or dangerous situation, described in our cases as `exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." Id. at 583, 100 S.Ct. 1371.
When the government invokes this exception to support the warrantless entry of a home, it must rebut the presumption that such entries are unreasonable. See Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). To do so, it must demonstrate a "grave emergency" that "makes a warrantless search imperative to the safety of the police and of the community." Illinois v. Rodriguez, 497 U.S. 177, 191, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). An entry is considered "imperative" when the government can show a "compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). As is often the case under the Fourth Amendment, "[t]he reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances." Zeigler v. State, 402 So.2d 365, 371 (Fla.1981).
The circumstances in which the Supreme Court has applied the exigent circumstances exception are "few in number and carefully delineated." U.S. District Court, 407 U.S. at 318, 92 S.Ct. 2125. They include pursuing a fleeing felon, Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), preventing the destruction of evidence, Schmerber v. California, 384 U.S. 757, 770-71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), searching incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and fighting fires, Tyler, 436 U.S. at 509, 98 S.Ct. 1942. Outside of those established categories, the Supreme Court "has often heard, and steadfastly rejected, the invitation to carve out further exceptions to the warrant requirement for searches of the home." Rodriguez, 497 U.S. at 192, 110 S.Ct. 2793.

*612 ....
... In other words, where safety is threatened and time is of the essence, we have recognized that "the need to protect life and to prevent serious bodily injury provides justification for an otherwise invalid entry." Arango v. State, 411 So.2d 172, 174 (Fla.1982).
918 So.2d at 278-79.
The facts of Riggs are instructive. A four-year-old child was found wandering naked and alone in the early morning hours in an apartment complex parking lot. The child was disoriented and had no idea from where she came. One apartment door was slightly ajar as though "somebody had come out of there." 918 So.2d at 276. The police entered the apartment because they were "concerned about the welfare of the parents [and] obviously we're also concerned about any type of child abandonment or anything like that." Id. Once inside, they continued calling out, again without response. On a coffee table in the living room, they noticed a plastic cigar tube containing some seeds (later determined to be marijuana). They then entered three rooms in succession. The first contained nothing unusual. The second contained seven potted marijuana plants with a fluorescent light suspended above them. In the third was Riggs, along with a woman later identified as the child's babysitter. After his arrest, Riggs confessed to growing the marijuana.
The State charged Riggs with manufacturing cannabis and possessing drug paraphernalia. Riggs pled not guilty and moved to suppress the evidence, claiming it was the fruit of an unreasonable search. At the suppression hearing, the State argued that exigent circumstances justified the warrantless entry. The trial court's suppression of the evidence was reversed by the Second District. See State v. Riggs, 890 So.2d 465 (Fla. 2d DCA 2004). The Florida Supreme Court agreed with the Second District that the police officers had an objectively reasonable basis to believe that the child's caretaker was in need of medical attention and was inside the defendant's apartment.[8] The court held that "authorities may enter a private dwelling based on a reasonable fear of a medical emergency."[9]Riggs, 918 So.2d at 281. In its opinion, the court reviewed its three leading cases involving warrantless entries based on feared medical emergencies:
Unlike the United States Supreme Court, we have addressed this issue several times and have upheld warrantless entries motivated by feared medical emergencies. Three cases stand out. In the first, we upheld a warrantless entry where the police tried to identify a chemical that had apparently poisoned seven children then in critical condition. Richardson v. State, 247 So.2d 296, 297-98 (Fla.1971). We emphasized that the "searches of the premises were made for the purpose of aiding doctors to save the children's lives and before defendant became [a] suspect." Id. at 298.

*613 In the second case, we upheld a warrantless entry to prevent a feared suicide attempt. Turner v. State, 645 So.2d 444 (Fla.1994). The defendant opened the door of his motel room to police and, leaving it ajar, walked back to his bed. He then pulled a gun and pointed it at his head. Confirming that "officers can make warrantless entries if they reasonably believe a person inside has immediate need," we held that "[t]his was such an emergency, so the officers did not err in entering Turner's motel room. And, once legally inside the room, police could seize evidence in plain view." Id. at 447.
In the third case, we held that defense counsel in a death-penalty trial was not deficient in failing to move to suppress evidence based on a warrantless entry into the defendant's home. See Zakrzewski v. State, 866 So.2d 688, 693-95 (Fla.2003). The police had received reports that the defendant failed to attend an Air Force class, that his home had a broken window, and that his mail was accumulating. An officer entered the defendant's home through the broken window because he "feared for the welfare of whomever may have been in the house at that time." Id. at 695 (quoting officer's testimony). We agreed that a motion to suppress would have been futile because the officer "did not enter [the defendant's] home with the intent to seize evidence or make an arrest." Id.

In all three cases, when the police entered the dwelling they suspected some kind of medical emergency. In Richardson, they did not know if they would find the unidentified poison. In Turner, they did not know if the defendant actually intended to kill himself. In Zakrzewski, they did not know why the defendant was missing. We deemed each entry reasonable. Our decisions therefore confirm that authorities may enter a private dwelling based on a reasonable fear of a medical emergency. In those limited circumstances, the sanctity of human life becomes more important than the sanctity of the home.
Id. at 280-81. The common denominator in each of the supreme court cases cited in Riggs is the presence of objective evidence pointing to a grave emergency inside the premises entered requiring immediate action by the police. That is simply not present here.
The State maintains, and the majority agrees, that Fourth Amendment jurisprudence, and Riggs in particular, support the trial court's conclusion that the deputy acted reasonably in entering Ortiz's home. However, unlike in Riggs or the cases it cited, here, the State offered no evidence to demonstrate an objectively reasonable basis to believe that the child's parents were: (a) inside the home and (b) likely in need of medical attention. When the deputy and child arrived at the house, there was no indication of foul play and no car was in the driveway. The house was dark and appeared empty. The deputy testified that he went into the home in an effort to reunite the child with his parents, not because of any perceived medical or other emergency, and only became concerned for the well-being of the child's parents when confronted with the locked master bedroom door. There is absolutely no evidence of a "grave emergency" as was found in Riggs, Richardson, Turner and Zakrzewski. To the contrary, there was a complete absence of evidence suggesting that the parents were even at home, except for the child's statement that his parents should be home. Since this six-year-old child had been at school all day, that information seems highly unreliable.
The conclusion that the State did not establish that an emergency situation existed *614 justifying the intrusion into the home does not detract from the trial court's finding that the deputy's actions were well intended. However, the deputy's "good intentions" to reunite the child with his parents do not control a determination of whether an emergency objectively appeared so as to justify law enforcement's warrantless intrusion into the home. The test for such a determination is an objective one, not a subjective one. See Rolling v. State, 695 So.2d 278, 293-94 (Fla.1997) (holding that to permit warrantless entry into home in emergency, objectively reasonable circumstances must exist that provide basis for officer to believe there is immediate need for police assistance for protection of life). Here, with no reasonable basis to believe the parents were in the home, let alone in need of assistance, there was no emergency demonstrated justifying the entry.[10] The officer must have "specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant [the] intrusion." State v. Alexander, 124 Md.App. 258, 721 A.2d 275, 285-85 (1998).
To justify a warrantless entry under the emergency aid exception, the police must have a reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. State v. Gill, 755 N.W.2d 454 (N.D.2008); see State v. Fisher, 141 Ariz. 227, 686 P.2d 750, 760-61 (1984); Lubenow v. North Dakota State Highway Comm'r, 438 N.W.2d 528, 533 (N.D.1989); see also 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6(a) (4th ed. 2004). The emergency aid exception does not give police officers carte blanche to make a warrantless entry whenever there is a theoretical possibility that another's life or safety may be in danger; rather, there must be an objectively reasonable belief that another's life or safety is in danger. See Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The emergency aid exception to the Fourth Amendment requires both an immediate crisis and the probability that assistance will be helpful. People v. Smith, 40 P.3d 1287, 1290 (Colo. 2002); People v. Amato, 193 Colo. 57, 562 P.2d 422, 424 (1977).
The majority and the concurring opinions also argue for the application of the "community caretaking" exception first enunciated in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), a case involving an automobile search. In Dombrowski, the Supreme Court held that Wisconsin police officers, who had arrested a Chicago police officer for driving while intoxicated, did not violate the Fourth Amendment in searching the defendant's automobile trunk for a service revolver, which the arresting officers believed Chicago police officers were required to carry at all times. The Court concluded that the warrantless search of the impounded vehicle's trunk was "constitutionally reasonable" because it was incident to the community caretaking function of the arresting officers to protect "the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 U.S. at 447, 93 S.Ct. 2523. The Court explained:
Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a *615 vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Id. at 441, 93 S.Ct. 2523 (emphasis added).
In large part, because the community caretaking function exception arose in the context of automobile searches, and given the historical distinction for Fourth Amendment purposes between automobiles and dwellings, Dombrowski, 413 U.S. at 447-48, 93 S.Ct. 2523 many courts have limited the exception to automobile searches and have declined to expand it to the warrantless entry of a residence. See, e.g., United States v. McGough, 412 F.3d 1232, 1238 (11th Cir.2005) (stating "we have never explicitly held that the community caretaking functions of a police officer permits the warrantless entry into a private home," and holding that officers' warrantless entry not objectively reasonable when not justified by any compelling exigency); United States v. Erickson, 991 F.2d 529 (9th Cir.1993) (refusing to extend community caretaking function to warrantless search of private home); United States v. Pichany, 687 F.2d 204 (7th Cir. 1982) (refusing to extend community caretaking function to warrantless search of warehouse); State v. Gill, 755 N.W.2d 454 (N.D.2008) (refusing to apply exception to warrantless search of dwelling). As the Eleventh Circuit stated in McGough, "Were we to apply the community caretaking exception ... in this case, we would undermine the [Fourth] Amendment's most fundamental premise: searches inside the home, without a warrant, are presumptively unreasonable." 412 F.3d at 1239. Other courts, however, have applied the exception to validate entry into a home. See, e.g., United States v. Rohrig, 98 F.3d 1506 (6th Cir.1996) (holding that officer's warrantless entry into home was reasonable and motivated by community caretaking interest in quelling loud noise); United States v. Nord, 586 F.2d 1288 (8th Cir.1978) (upholding warrantless entry of home).
The Florida cases that have relied on the community caretaker exception have done so only in the context of vehicle and boat searches.[11] And perhaps more importantly, the Florida Supreme Court expressly declined to adopt or rely on the community caretaking exception when given the opportunity to consider it in Riggs, because, as the court observed, Dombrowski "was expressly limited to the automobile context." 918 So.2d at 280 n. 1. Other than situations involving the medical emergency exception, until today, the community caretaker exception has not been applied in Florida as a separate exception to the Fourth Amendment to validate an entry into a residence.[12]
*616 In denying Ortiz's motion to suppress, the trial court also concluded that the six-year-old child had the apparent authority to allow the deputy access to the home. The majority correctly does not rely on the child's consent to justify the entry. It is well settled that "[i]n the absence of a warrant or exigent circumstances justifying a search, the State has the burden of proving the police were given free and voluntary consent to enter the premises by someone with actual or apparent authority to do so." Williams v. State, 788 So.2d 334, 336 (Fla. 5th DCA 2001). A minor may provide valid third-party consent for a warrantless entry of a home that the minor shares with a parent if the State can establish that: (1) the minor shares the home with an absent, non-consenting parent; (2) the police officer conducting the entry into the home reasonably believes, based on articulable facts, that the minor shares common authority with the parent to allow entry into the home; and (3) by clear and convincing evidence, the minor's consent was freely and voluntarily given under the totality of the circumstances. Saavedra v. State, 622 So.2d 952, 954 (Fla. 1993) (adopting common authority test to determine validity of third-party consent set out in United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), which held that voluntary consent to search not limited to defendant but can be obtained from third party with common authority over or other sufficient relationship to premises or effects sought to be inspected).[13]
However, before an officer may be admitted into areas of the home other than common living areas, the officer must have a reasonable belief that the child consenting to the entry shares common authority over those areas. In determining the reasonableness of the police officer's belief, courts should consider the minor's age, maturity and intelligence. Saavedra, 622 So.2d at 958. In a directive relevant to the instant case, the Saavedra court stated:
The courts should also consider any other facts which might show that a police officer reasonably believed that a minor shared joint authority over the home, such as whether the minor had permission to allow entry into the home, whether the minor had a key to the home, and whether the minor shared common household duties with the parent. Certainly, it would be unreasonable to suggest that a child of tender years shared common authority with the parent over entry into a home. See Laasch v. State, 84 Wis.2d 587, 267 N.W.2d 278, 282 (1978) (holding that the state did not show that defendant's five-year-old son possessed the capacity, the intelligence, or the authority to give constitutionally effective consent).
Id. The State had the burden of demonstrating the child's authority to consent to the entry. Because it offered no evidence on the matter, the trial court's conclusion that the child could and did give consent to *617 the entry is without any evidential foundation. Even assuming that the child had the authority, actual or apparent, to consent to the deputy's entry into the common areas of the home, the record fails to establish that the child could validly consent to entry of the locked master bedroom. Neither does the record demonstrate that once at the locked bedroom door, any "grave emergency" was apparent that authorized the deputy to enter the bedroom.
Under the facts presented here, the deputy's warrantless entry into the home and the locked bedroom did not fall within the medical emergency exception to the warrant requirement. Nor did the State establish that the deputy had valid consent to enter the locked bedroom. Consequently, I would reverse the trial court's order denying the motion to suppress evidence.
There is no doubt that this case presents a difficult issue. However, given the high value our society places on the sanctity of an individual's home, we should resolve the question against even well-intended intrusions into the home by the government. Courts must act as vigilant gatekeepers to insure that exceptions do not consume the cherished protections of the Fourth Amendment. The majority's decision fails in that respect and will allow the exceptions to swallow the rule.[14]
COHEN, J., concurs.
EVANDER, J., dissenting.
There were two motivations behind the officer's initial entry into the Ortiz residence  (1) the desire to reunify the child with his parents, and (2) a belief that someone in the child's home might be in need of medical assistance. For the reasons set forth in Judge Orfinger's dissent, I conclude that the evidence was insufficient to demonstrate an objectively reasonable basis to believe that there was a "feared medical emergency." Thus, the issue is what weight, if any, should be given to the officer's desire to reunite the child with his parents.[15] If the community caretaker exception was found to be applicable to residences, then the State's interest in seeking prompt reunification of the young child with his parents should be given significant weight and the majority's position might be well taken. However, if the community caretaker exception is inapplicable, then this factor should be given little weight and the State's argument must fail. Because I believe that in Riggs v. State, 918 So.2d 274 (Fla.2005) our supreme court implicitly rejected application of the community caretaker exception with regard to residences, I respectfully dissent.
ORFINGER, J., concurs.
COHEN, J., dissenting.
I concur in Judge Orfinger's dissent that there was no objective evidence of a grave emergency that justified the officer's warrantless entry into the home. I write only to elaborate on why granting rehearing en banc was inappropriate, and to further elucidate the Fourth Amendment principles involved.
*618 As both the majority and Judge Orfinger point out, there are only two reasons this court may grant rehearing en banc: when the case is of "exceptional importance," or it is necessary "to maintain uniformity in the court's decisions." Fla. R.App. P. 9.331(a). The majority concludes this case is exceptionally important because it "fleshes out the borders of both the `feared medical emergency' exception to the warrant requirement ... and the now well-recognized community caretaking function of police officers." In summarily dismissing the assertion that the original panel's opinion did not conflict with Riggs v. State, 918 So.2d 274 (Fla.2005), the majority states, "[we have] concluded otherwise. Indeed, Riggs compels a conclusion far different than that dictated by the original decision." Thus, it appears the majority also believes the original panel did not follow binding supreme court precedent in rendering its decision. Closer scrutiny of both reasons demonstrates why rehearing en banc was improvidently granted in this case.
Whether a particular case is "exceptionally important" such that it warrants granting rehearing en banc requires thoughtful and reasoned discretion on the part of each member of this court. The term "exceptional importance" is not defined in the rules of appellate procedure, yet every member of this court realizes that only a select few cases will ever meet this threshold. Despite the lack of any formal guidance, there are numerous reasons judges have given for deciding a case is exceptionally important.
Some judges contend a case is exceptionally important when the original panel opinion "expressly and directly conflicts with a rule of law" announced by either the supreme court or another district court of appeal. State v. Diamond, 553 So.2d 1185, 1199 (Fla. 1st DCA 1988) (Ervin, J., concurring). Others have indicated that when a case is "exceptionally important to the jurisprudence of the State as a judicial precedent," State v. Georgoudiou, 560 So.2d 1241, 1247-48 (Fla. 5th DCA 1990) (Cowart, J., dissenting); Chancellor Media Whiteco Outdoor v. Department of Transportation, 795 So.2d 991, 997 (Fla. 5th DCA 2001) (Pleus, J., dissenting), or has "issues that impact a larger share of the community or the jurisprudence of the state," In re Doe, 973 So.2d 548, 556 (Fla. 2d DCA 2008) (Casanueva, J., concurring), it is exceptionally important. A case may also be exceptionally important when its outcome could "reasonably and negatively influence the public's perception of the judiciary's ability to render meaningful justice." Univ. of Miami v. Wilson, 948 So.2d 774, 791 (Fla. 3d DCA 2006) (Shepherd, J., concurring).
We are also mindful of opinions from the federal circuit court of appeals in making this determination. This is because Florida Rule of Appellate Procedure 9.331 was patterned after the en banc rule of the Fifth and Eleventh Circuits. See Fla. R.App. P. 9.331 (committee notes). As currently worded, rule 9.331 is very similar to Federal Rule of Appellate Procedure 35. The Fifth Circuit maintains the practice of granting en banc review only for those cases involving "`a precedent-setting error of exceptional public importance or an opinion which directly conflicts with prior Supreme Court [or] Fifth Circuit precedent.'" Gonzalez v. Southern Pacific Transp. Co., 773 F.2d 637, 641 (5th Cir. 1985) (quoting Internal Operating Procedures of the United States Court of Appeals for the Fifth Circuit accompanying Local Rule 35). As the Fifth Circuit has recognized, a case does not rise to the level of "exceptional public importance" when the panel error "would at most amount to one of misapplication of precedent to the facts at hand, rather than establishing a *619 new precedent of exceptional public importance." Id. Every member of this court would no doubt agree that a case is not exceptionally important simply because the "en banc majority disagrees with the reasoning or result of a panel majority." Georgoudiou, 560 So.2d at 1247.
I certainly do not profess to possess or even advocate any definite or certain criteria for this court, or any judge, for that matter, to determine when a case rises to the talismanic level of "exceptional importance." Each of the justifications set forth above appear to be logical, reasonable bases. However, the reasons the majority gives for granting rehearing en banc do not fall within these bounds. Consequently, I am compelled to conclude that granting rehearing en banc was inappropriate.
The original panel opinion held that the facts did not establish "a reasonable basis to believe that a grave emergency existed" that made it imperative for the officer to make a warrantless entry into the home. Ortiz v. State, 34 Fla. L. Weekly D829, D831 (Fla. 5th DCA Apr. 24, 2009). In reaching this conclusion, the original panel distinguished Riggs, 918 So.2d 274, and supported its decision with an analysis of Wheeler v. State, 956 So.2d 517 (Fla. 2d DCA 2007). The original panel opinion also held that the State failed to establish that the officer obtained valid consent from the six-year-old child to enter the locked bedroom.[16]Id. at D833.
The majority asserts that these holdings had "potentially far-reaching negative effects on the actions of law-enforcement officers." However, the opinion only held that the "evidence in this case simply does not rise to the level" in Riggs, and therefore was distinguishable. Id. at D831. This in no way enlarged, narrowed, eviscerated, or so much as even conflicted with the feared medical emergency exception enunciated in Riggs. To put it very plainly, the original panel opinion did not change or alter the state of the law as set forth in Riggs or any decision of this court. It is also unclear how distinguishing Riggs on its facts could have possibly conflicted with any rule of law set forth therein. It certainly did not hold any exceptional importance to this state's jurisprudence.
The original panel opinion also did not hold that the community caretaker exception could never apply to a warrantless search of a home. Although the original panel "was unwilling to adopt [the] exception in the case of residential searches," this statement was clear dicta because it was made in the context of rebutting the dissent's arguments. Id. at D832. Even if this were one of the original panel's holdings, it would not have conflicted with any rule or principle of law announced by the supreme court. This was clearly recognized by Chief Judge Monaco in his dissent when he acknowledged that the supreme court had never applied the community caretaker exception to allow a search of a house, "primarily because of language in [Cady v.] Dombrowski [413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)] that appears to limit the holding to searches of automobiles." Id. at D834. That the original panel was unwilling to extend the community caretaker exception to searches of homes is really quite unremarkable, particularly in light of its finding that Florida cases relying on the community caretaker exception only did so in the context of automobile or boat searches. This finding, as the majority is forced to recognize, has legal support. In any event, the original panel's discussion *620 of the community caretaker doctrine did not create a new precedent that would have had any profound or exceptionally important effect on this state's jurisprudence. It simply maintained the status quo.
The majority finds this case to be exceptionally important so they can flesh out "the borders" of two warrant exceptions, to correct the original panel opinion's "potentially far-reaching negative effects," and because they have concluded the original panel opinion conflicted with Riggs. However, as I have set forth above, a closer inspection of these reasons, although perhaps facially compelling, are unavailing. Even Judge Torpy in his concurrence admits that "the point is fairly debatable" depending on how one defines exigent circumstances. Because the original panel's opinion did not create new precedent, did not conflict with a rule of law set forth by the supreme court or a district court of appeal, and was not exceptionally important to the jurisprudence of this state, I believe granting rehearing en banc was inappropriate. Furthermore, assuming arguendo the original panel opinion was erroneous, at most it would have amounted to misapplying precedent to the specific facts of this case, but would not have created new precedent. See United States v. Nixon, 827 F.2d 1019, 1023 (5th Cir.1987).
The plain text of the Fourth Amendment prohibits all unreasonable searches and seizures unless supported by a warrant. See Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The "chief evil" the Fourth Amendment addresses is the "`physical entry of the home,'" id. (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)), because the purpose of the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). As the Supreme Court noted in Payton, 445 U.S. at 582 n. 17, 100 S.Ct. 1371, "[a]t the core of the Fourth Amendment... is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must be strictly circumscribed." Nowhere is the "zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home...." Payton, 445 U.S. at 589, 100 S.Ct. 1371. Thus, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590, 100 S.Ct. 1371. As Judge Orfinger has cogently set forth in his dissent, no such exigencies were present in this case.
The Fourth Amendment's protection against arbitrary invasions of a person's privacy and security is not limited to police searches or seizures. See Camara, 387 U.S. at 530, 87 S.Ct. 1727 (It would surely be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when ... suspected of criminal behavior."). It also applies to fire marshals, building inspectors, or health inspectors whose purpose may be to "locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection." Michigan v. Tyler, 436 U.S. 499, 504, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Simply put, the warrant requirement applies equally to administrative searches, as well as criminal searches. Id.; Camara, 387 U.S. at 534, 87 S.Ct. 1727. Thus, the fact that the officer's search in this case was for the "laudable" and "legitimate" aim of finding the child's parents, and not *621 evidence or instrumentalities of crime, is not determinative of a Fourth Amendment violation. Certainly, the officer's reason for the warrantless entry in this case was no more or less legitimate than the argument that a warrantless administrative search should be allowed because the "health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards. . . ." Camara, 387 U.S. at 533, 87 S.Ct. 1727. This argument was unequivocally rejected by the Supreme Court in Camara.
Because the Fourth Amendment protects against all arbitrary invasions into the home by the government, I believe that the officer's warrantless entry in this case is constitutionally infirm. When the officer arrived at the house, he only knew that the child's parents had not picked him up from school and that it did not appear that anyone was home. By sanctioning the officer to enter without a warrant, the majority has weakened the protections secured by the Fourth Amendment.
For all the foregoing reasons, I respectfully dissent.
ORFINGER, JJ., concur.
NOTES
[1] The deputy testified that he thought that he did not help the child open the garage door. He conceded, however, that he may have helped the child lift the door.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] This interpretation is grounded in the text of the Fourth Amendment itself. The first clause of the Fourth Amendment contains a general prohibition against unreasonable searches. The second clause pertains only to the requirements for warrants for searches in criminal cases. See Amend. IV, U.S. Const.
[4] See Wallace v. Dean, 3 So.3d 1035, 1052 (Fla.2009) (imposing liability on law enforcement officers under undertaker's doctrine).
[5] Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses  even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society's problem solvers when no other solution is apparent or available.
[6] For example, when the police become aware that the door to a business is unlocked at a late hour, even in the absence of evidence of forced entry or other emergency, it is reasonable for them to enter the business to check for intruders, verify that the property is otherwise secure and locate contact information for the owner, as part of their caretaking function. Intrusions of this nature may also be justified because of the implicit relinquishment of privacy expectations by the owner.
[7] Consent is, of course, another warrant requirement exception. See, e.g., Lynch v. State, 2 So.3d 47, 68 n. 11 (Fla.2008) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).
[8] The Riggs court disapproved the majority opinion in Eason v. State, 546 So.2d 57 (Fla. 1st DCA 1989), where, on similar facts, the First District, over the dissent of Chief Judge Smith, found an entry violated the Fourth Amendment. The Riggs court noted that in Eason, the young boy actually led the police to a particular apartment and said "Mommy's in there," a fact that may strengthen the validity of an ensuing entry based on suspicion of a medical emergency.
[9] It is immaterial whether an actual medical emergency existed; rather, the test is whether police "reasonably believed an emergency existed at the time of the warrantless entry." Eastes v. State, 960 So.2d 873, 875 (Fla. 5th DCA 2007).
[10] If the deputy was not legally inside the home when he observed the drugs in the bathroom, the plain view doctrine is inapplicable. See Ensor v. State, 403 So.2d 349, 352 (Fla.1981). As a result, Ortiz's statements to the deputy should also be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[11] See Castella v. State, 959 So.2d 1285 (Fla. 4th DCA 2007); State v. Patrick, 437 So.2d 217 (Fla. 4th DCA 1983); Lovett v. State, 403 So.2d 1079 (Fla. 1st DCA 1981); Cobb v. State, 378 So.2d 82 (Fla. 3d DCA 1979).
[12] In his concurring opinion, Judge Torpy cites Herring v. United States, ___ U.S. ___, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) for the proposition that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it...." [The] exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Whether the exclusionary rule should apply here is an interesting question but one that was not argued by the State below and hence, not preserved for review.
[13] Third-party consent may be valid under either an actual or apparent authority theory. In Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the United States Supreme Court extended the validity of third-party consent and held that a search is constitutional if based upon the consent of a third party when an officer has a reasonable basis to believe that the consenting person has common authority over the premises.
[14] Judge Torpy's concurrence is premised, in part, on his supposition that "it is not likely that a parent would forget to pick up a child of this age at this time of day for this period of time." However, Deputy Mercado testified that the Sheriff's Department routinely receives forgotten child calls.
[15] Indeed, the officer's only viable option to seeking to locate the child's parents was to place the child in the custody of the Department of Children and Families  a "solution" that comes with its own set of potential adverse consequences.
[16] This holding is not being challenged. Quite tellingly, only one judge of this court agreed that the evidence supported a warrantless entry of a home based upon the consent of a six-year-old child, despite this being the primary basis of the trial court's denial of the motion to suppress.